## BOWERS, *Appellant*, v. SMITH.

### In Banc, June 20, 1892.

1. **Elections:** AUSTRALIAN BALLOT LAWS. The "Australian ballot laws" of England, Missouri and other states compared and discussed.

2. ——: ——: ADDITIONAL NAMES ON BALLOT. Under the Missouri ballot act of 1889 (Revised Statutes, 1889, secs. 4756-4794), an error of the county clerk, in printing names of additional candidates on the official ballots, will not nullify the election at which those ballots are used, where no objection to them is made (as provided by that law) before the election.

3. ——: ——: POLLING PLACES. Where the votes in a certain election district were received at two polling places instead of at one, that irregularity will not vitiate the returns, where no prejudice or disadvantage to the defeated candidate appears to have resulted.

4. ——: MANDATORY AND DIRECTORY PROVISIONS. Mandatory and directory provisions of election laws discussed.

5. ——: IRREGULARITIES: FRAUD. Where the legislature declares a certain irregularity in election procedure as fatal to the validity of the returns, the courts will effectuate that command; otherwise they will ignore such innocent irregularities of election officers as are free of fraud, and have not interfered with a fair expression of the voter's will.

| 111 | 45 |
| 115 | 36 |
| 111 | 45 |
| 130 | 629 |
| 111 | 45 |
| 132 | 68 |
| 111 | 45 |
| 74a | 207 |
| 111 | 45 |
| o154 | 614 |
| 154 | 615 |
| 154 | 616 |
| o154 | 617 |
| 111 | 45 |
| o155 | 82 |
| 111 | 45 |
| 160 | 16 |
| 111 | 45 |
| 89a | 591 |

Bowers v. Smith.

6. ——: CONTEST: STATEMENT. An allegation in a statutory election contest that a list of names of party candidates was "illegally certified," without alleging how it was certified, or in what respects it was defective, is merely the statement of a legal conclusion, and not of a fact.

7. ——: CONSTRUCTION OF LAW: ERROR OF OFFICIAL. Such a construction of an election law as would permit the disfranchisement of large bodies of voters because of an error of a single official should not be adopted where the language is fairly susceptible of any other.

8. ——: STATUTE FROM ANOTHER STATE, CONSTRUCTION OF. Where a statute is adopted from another state, its construction there is not likewise adopted, if inconsistent with the constitution of the state in which it is transplanted.

9. ——: OFFICIAL BALLOT, ADDING NAME TO. Under the Missouri ballot law of 1889, an elector may vote for candidates whose names do not appear upon the official printed ballots, by adding their names upon the ballots in the proper places.

10. Law, Construction of. It is proper to consider the effect and consequences of a proposed interpretation of a law to ascertain what is probably its true intent.

*Appeal from Pettis Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED.

THE official ballot mentioned in the opinion (omitting immaterial parts) is as follows, viz.:

STATE, COUNTY AND TOWNSHIP TICKET, PETTIS COUNTY, MISSOURI.

| DEMOCRATIC. | REPUBLICAN. | UNION-LABOR. |
|---|---|---|
| *  *  *  * | *  *  *  * | *  *  *  * |
| *  *  *  * | *  *  *  * | *  *  *  * |
| *  *  *  * | *  *  *  * | *  *  *  * |
| *For Sheriff.* | *For Sheriff.* | *For Sheriff.* |
| J. A. BOWERS. | ELLIS R. SMITH. | G. D. SAPPINGTON. |
| *  *  *  * | *  *  *  * | *  *  *  * |
| *  *  *  * | *  *  *  * | *  *  *  * |
| *  *  *  * | *  *  *  * | *  *  *  * |

(The blanks in the ballot, indicated above by asterisks, were filled in the original with the names of

the several party nominees for the various state, county and township offices.)

The other material facts appear in the opinion.

*Jackson & Montgomery* and *Charles E. Yeater* for appellant.

(1) The violation of a statutory provision for the conduct of elections, which is mandatory in its nature, will avoid the election to the extent of the violation, without regard to the motive of the persons guilty of the violation, and without any inquiry into the effect of the result of the election. 6 American & English Encyclopedia of Law, 325; *Gumm v. Hubbard*, 97 Mo. 311; *Keller v. Toulme*, 7 S. Rep. 508; *Ledbetter v. Hall*, 62 Mo. 422; *West v. Ross*, 53 Mo. 350; *State v. Cook*, 41 Mo. 598; McCrary on Elections [3 Ed.] sec. 190. (2) Section 4673, Revised Statutes, 1889, provides that only one polling place shall be had and one set of judges and clerks appointed for each precinct, and the holding of two polling places in a precinct with two sets of judges and clerks renders the vote of the precinct invalid and illegal. McCrary on Elections [2 Ed.] 108; [3 Ed.] sec. 249; *Sloan v. Rawles*, 43 Congress. (3) The judges and clerks of the two polling places in the Sedalia city precinct were not *de facto* officers, for the reason that *a de facto* officer necessarily presupposes the existence of a legal office which might be filled by a *de jure* officer, and the creation of the two polling places in violation of the mandatory provisions of section 4673, Revised Statutes, 1889, could not constitute legal officers for the maintenance of such illegal polling places. *Jester v. Spurgeon*, 27 Mo. App. 477; *Ex parte Snyder*, 64 Mo. 58. (4) The ballots cast in the Sedalia city precinct did not conform to the provisions of article 3 of chapter 60 on elections, Revised Statutes, 1889,

because they contained the names of the candidates of the alleged Union-Labor party, which party had not cast three per cent. of the vote at the last general election, nor had the nomination of the candidates of such party been certified to the county clerk in the manner prescribed by such article, and such ballots cannot be counted under the mandatory clause of section 4671 of such chapter. *Gumm v. Hubbard*, 97 Mo. 311; *Ledbetter v. Hall*, 62 Mo. 422; *West v. Ross*, 53 Mo. 350; *Price v. Lush*, 24 Pac. Rep. 749; *Queen v. Parkinson*, L. R. 3 Q. B. 11; *Mather v. Brown*, 1 C. P. Div. 596; *Howes v. Turner*, 1 C. P. Div. 670; *Monks v. Jackson*, 1 C. P. Div. 683; *Burgoyne v. Collins*, 8 Q. B. Div. 452; Wigmore on Australian Ballot System [2 Ed.] 186, 187, and Australian and New South Wales cases cited therein. (5) The certification of the nomination of the candidates of the alleged Union-Labor party was in violation of article 3 of chapter 60, Revised Statutes, 1889, and the names of such candidates should not have been printed on the official ballots; as a result of which such ballots cannot be counted under the mandatory clause of section 4773 of such article. Cases, *supra*, under 1 and 4. (6) By reason of the fact that the clerk of the county court violated the provisions of article 3 of chapter 60, Revised Statutes, 1889, in placing the candidates of the alleged Union-Labor party on the official ballots, such ballots cannot be counted under the mandatory clause of section 4772 of such article. Cases, *supra*, under 1 and 4. (7) Article 3 of chapter 60, Revised Statutes, 1889, is not in conflict with those provisions of the constitution which prescribe the qualifications of electors and declare that all elections shall be free and open, and that no power shall interfere to prevent the free exercise of the right of suffrage. *Blair v. Ridgely*, 41 Mo. 167; *Common Council v. Rush*, 46 N. W. Rep. 951. (8) Section

4778 contains only provisions by which an error or omission in the publication of the names or description of candidates may be corrected by an application which brings the county clerk alone before the circuit or county court, and it does not contain any provision for notifying any person that his right to be a candidate for office on the official ballot is to be questioned or adjudicated.

*W. S. Shirk, Bothwell & Jaynes* and *Sangree & Lamm* for respondent.

Statutes regulating elections should be given such construction and application as will secure more firmly the rights of the electors conferred by the constitution and express more accurately the will of the people; and not to allow statutory regulations to be so applied as to impair the right of suffrage by putting the result within the control of ignorant or careless or dishonest officials, and beyond the reach of the courts or the people. *Whipley v. McCune*, 12 Cal. 352; *Fowler v. State*, 3 S. W. Rep. (Tex.) 225; Cooley's Constitutional Limitations, 612, 771. (1) The court committed no error in striking out contestant's fourth ground of contest. "It may be said that the tendency of the courts, and also of legislative bodies, is not to hold a provision mandatory unless it is clearly of such a character that its violation will tend to prevent a correct determination of the result of the election, unless it is declared in the law that its violation shall render the election void. This is true, even if the language is prohibitory as to the officers, or even if its violation may subject the offending officer to penal liability." 6 American & English Encyclopedia of Law, p. 324; McCrary on Elections [3 Ed.] sec. 190. (2) The court com-

mitted no error in striking out the fifth ground of contest. It is inconsistent with the allegations of the third ground. There is nothing in section 4673, Revised Statutes, 1889, in .relation to the place of holding the elections; and it cannot be asserted ·that the election in the Sedalia precinct was held at any unlawful or unusual place. *Stemper v. Higgins* (Minn.); *Davis v. State,* 12 S. W. Rep. 957. (3) There was no error in striking out the seventh ground of contest, the allegations therein being repugnant to those set forth in the third ground. In all the cases cited by the industrious and accomplished counsel for appellant, construing the so-called Australian-ballot act, there can be found none that holds a ballot illegal or an election void because of an irregularity common to both parties to the contest, affecting both alike, not affecting the result, and not brought about by the contestee.

BARCLAY, J.—This appeal was first heard in division 1, and a conclusion announced, November 9, 1891, as reported in 17 S. W. Rep. 761.

After a motion for rehearing was denied, plaintiff moved to transfer the cause to the court *in banc.* The motion was ultimately sustained, upon the entry of a dissent by one of the judges to the decision of the first division.

The case was then fully reargued before the whole court.

It is a statutory contest to determine the respective rights of the parties to the office of sheriff of Pettis county.

The election in question took place November 4, 1890. Mr. Bowers is the contestant. For convenience, he will be called the plaintiff, and his opponent, Mr. Smith, who is the contestee, the defendant.

Bowers v. Smith.

Plaintiff's notice of contest assigned several distinct grounds, in as many paragraphs, in the nature of counts, or causes of action. After it was served, defendant gave plaintiff a counter-notice, which (besides denying the plaintiff's charges) alleged a number of objections to the original count of the ballots, and claimed that corrections, to defendant's advantage, should be made therein in a number of particulars.

The circuit court of Pettis county sustained motions to strike out some parts of plaintiff's notice. Exceptions were saved to that ruling.

The case then came to trial. As will appear, the real issues were finally resolved into questions of law, and upon them the trial court found for the defendant.

Plaintiff then appealed, after the usual motions.

After the formal contest began, plaintiff applied for, and obtained a recount, by the county clerk, of the original ballots cast at all the precincts in the county. The recount was conducted as provided by the statute on that subject. Revised Statutes, 1889, secs. 4721–4726. It resulted in an exhibit that defendant had a plurality over the plaintiff of thirty-three votes in the county, and that no less than three thousand voters had cast their ballots in the city of Sedalia at that election.

Both parties rely on the recent statute concerning elections (Revised Statutes, 1889, secs. 4756–4794), commonly known as the "Australian Ballot Law," as first enacted in this state. It is thus conceded to apply to Sedalia as a city of over five thousand population. The points of difference to be determined relate to features of the election in that city, held under that law.

We need not pause to state the particulars of the rulings in the trial court, raising the material questions

involved, but shall proceed at once to the merits of the dispute.

Plaintiff's contention is that the entire returns from Sedalia should be thrown out of the final count, for several reasons.

I.  He claims that the official ballots, printed by the county clerk for use at the voting places in that city, contained (among others) the names of the nominees of the Union-Labor party, and that that political party had not polled three per cent. of the entire vote at the last previous general election, as required by section 4760, Revised Statutes, 1889.

Conceding (without investigating) the fact on which that claim rests, does it follow that the vote of the precinct should be discarded?

In interpreting the statute in question, it must be remembered that its adoption here brings it into subordination to the fundamental law of Missouri, and that prior decisions, elsewhere, construing enactments on the same general topic, cannot properly be followed if inconsistent with that fundamental law.

By our constitution general elections are held at certain fixed dates, and the right of suffrage is expressly secured to every citizen possessing the requisite qualifications.  The new ballot law cannot properly be construed to abridge the right of voters to name their public servants at such elections, or to limit the range of choice (for constitutional offices) to persons nominated in the modes prescribed by it.  Nominations under it entitle the nominees to places upon the official ballots, printed at public expense; but the Missouri voter is still at liberty to write on his ballot other names than those which may be printed there.

The statute recognizes this right by requiring sufficient blank space for such writing, next to the

printed names of candidates for each office.   Revised Statutes, 1889, sec. 4773.

In this respect our law differs from the English act of 1872, under which no actual poll of voters is held, unless more candidates are formally nominated than there are vacancies to be filled.

These observations seem necessary to guard against the supposed effect of adjudications in other states or countries, construing features of such laws differing from those in force in this state.

The living question which this case presents is what construction shall be given to the Missouri statute on this subject, and to what extent the constitutional rights of voters depend upon the correctness of action of the county clerk in preparing and printing the official ballots.

The act of the clerk which is called in question consisted of admitting names to the ballot, not of excluding any.

There is a substantial difference, in principle and in effect, between admitting and excluding such names.

The practical consequence of erroneously adding a name to the ticket is merely to enlarge the voter's range of choice among candidates on the official list. In Missouri any voter may add such a name for himself in the blank provided on the ballot for that purpose.

How then are errors of this sort to be treated?

Plaintiff insists that they vitiate the whole return; that every such error of judgment is a sufficient ground to disfranchise the voters of the locality where such ballots are used.

The law in question presents a number of points at which errors may be expected of the most faithful and conscientious officers.   It will often require nice judgment to determine (among other things) whether party candidates have been regularly nominated; how

declinations should be treated; whether certificates of independent nominations have the necessary signatures; whether the signers are "resident electors;" whether nomination certificates are formally sufficient under the law; or whether acknowledgments thereof have been "executed with the formalities prescribed for the execution of an instrument affecting real estate." Revised Statutes, 1889, secs. 4756–4763.

It is declared to be the duty of the county clerk to provide the ballots, and that all others than those printed by him according to the provisions of this law "shall not be cast or counted in any election." The plain meaning and purpose of this expression can be seen from the context in the section in which it occurs and that which next follows. Revised Statutes, 1889, secs. 4772–3. The design is to preclude the voter and his party friends from supplying his own ballot (as was the former practice), and to compel him to use only that furnished by the state, through the county clerk. The latter is directed to print no other names on the voting papers than those of the candidates nominated according to the provisions of that law. The title of the original act (Session Acts, 1889, p. 105) and its opening lines show that uniformity in the printing and appearance of the ballots is one of the main objects aimed at. The prohibitions above noted are inserted to further that object; but they give no countenance to the notion, advanced by the plaintiff, that their purpose or effect is to nullify the result of every election at which the county clerk may make some error in publishing or printing the names on the only ballots that can be used.

Legislative language should be clear and unequivocal to justify an inference that such consequences were intended to flow from it. Rutherforth on Institutes [2 Am. Ed.] p. 413.

The printing of the ballots "according to the provisions of this" law, and the antecedent making up of a ticket to be printed (by acting on the nominations submitted) are two distinct official duties. The county clerk prints all the ballots. But he does not act originally on all the nomination papers.

Some of the latter are submitted to the secretary of state and he certifies certain nominees to the county clerk. Revised Statutes, 1889, sec. 4767.

Errors in omitting or adding names to the list of candidates, by rulings on the nominating documents, are distinguished from errors made in the mere printing of ballots, by the terms of the law itself. Section 4778 provides a summary remedy to correct any "error or omission in the publication of the names or description of candidates nominated for office, *or* in the printing of the ballots." So that the language of section 4772, forbidding other ballots than "those printed by the respective clerks of the county courts according to the provisions of this article" to be cast or counted, obviously carries no such meaning as to nullify ballots, printed by county clerks as directed by the law, and cast by voters in conformity thereto, but incorrectly made up beforehand by the secretary of state or the county clerk by erroneously admitting some candidate's name to a place on the ballot.

The suffrage is regarded with jealous solicitude by a free people, and should be so viewed by those intrusted with the mighty power of guarding and vindicating their sovereign rights. Such a construction of a law as would permit the disfranchisement of large bodies of voters, because of an error of a single official, should never be adopted where the language in question is fairly susceptible of any other. *Wells v. Stanforth* (1885), 16 Q. B. Div. 245.

Or, as a very able judge once tersely said: "All statutes tending to limit the citizen in his exercise of this right [of suffrage] should be liberally construed in his favor." *Owens v. State ex rel.* (1885), 64 Tex. 509.

It is proper, and often necessary, to consider the effect and consequences of a proposed interpretation of a law to ascertain what is probably its true intent. *State v. Hope* (1889), 100 Mo. 361; 8 L. R. A. 608. The consequences which would inevitably follow the acceptance of the reading proposed by the plaintiff are so far-reaching and disastrous that they constitute a vigorous argument against adopting it.

More than that, section 4778 clearly discloses a legislative design to provide for the correction of just such errors as we are considering, at the instance of any elector (including every one interested) before the election. The process is so summary that the inference is irresistible that the errors it is designed to reach should be rectified by prompt action then, so as not to subject voters to the risk of losing their votes by reason of those errors.

"Sec. 4778. Whenever it shall appear by affidavit that an error or omission has occurred in the publication of the names or description of candidates nominated for office, or in the printing of the ballots, the circuit court of any county, or the judge thereof in vacation, or if the circuit judge is then absent from the county, a judge of the county court, may, upon application by any elector, by order, require the clerk of the county court to correct such error, or to show cause why such error should not be corrected."

In connection with this section, it should be remembered that, "at least seven days before an election," the county clerk is required to cause the list of nominations, "arranged in the order and form in

which they will be printed upon the ballot," to be published in the newspapers as provided in sections 4768-9. Thus every one in interest is apprised of the names of all candidates, as determined by the clerk, at least one week before election day, to the end that steps may be taken, if desired (as indicated by the language quoted), to supply any omissions or to correct other errors in that list as published. If full effect be given to that section, the injustice and unfairness which otherwise would result in the practical working of the statute will be avoided.

This "ballot reform law" was intended to improve the methods for giving expression to the popular will in the choice of public officers. It should be construed so as to promote, not destroy, the great objects in view in its passage. It resembles and, in the main, follows statutes elsewhere on the same subject; but is not identical with its models at all points. A glance at these models, however, will show how foreign to the reason and spirit of such legislation is the idea that the unwary voter is to be subjected, in the name of "reform," to the risk of losing the right of suffrage every time an error in admitting a name to the official ballot is made by an officer passing upon the regularity of nominating papers, when no objection to his ruling is made before the election. Section 4778 was evidently framed with the view to avert such risk. It coincides with part of section 19 of the New York law of 1890. It is not found in the English statute, but there we read that "the returning officer shall decide on the validity of every objection made to a nomination paper, and his decision, if disallowing the objection, shall be final; but, if allowing the same, shall be subject to reversal on petition questioning the election or return." 35 & 36 Vict. (1872), ch. 33, sched. 1, sec. 13, p. 214, This provision applied at first to parliamentary elections

only; but, after the decision in *Northcote v. Pulsford* (May 8, 1875), 10 C. P. (L. R.) 476, it was extended to municipal elections (the kind considered in that case) by the amendment of July 19, 1875. 38 & 39 Vict., ch. 40, sec. 1, p. 283.

So that, in England and New York to-day, the erroneous addition of a name to the official list of nominees, though not corrected before the election, is harmless in its effect upon the voter's right to use the official ballot without fear of possible disfranchisement. This, we consider, is also the proper meaning to be placed upon the law of Missouri. Any other would metamorphose the supposed "reform" into a gigantic trap where the inoffensive citizen might readily be deprived of his most valuable right as a freeman by political manœuvres in the form of "errors," the force of which he could not foresee until too late to avoid their consequences.

A single case appears to antagonize the conclusion we have reached on this point, namely *Price v. Lush* (1890); 10 Mont. 61. With all respect due to the court that decided it, we think it embodies a misapplication of the English precedents which it cites. It entirely omits to mention or consider the effect of section 19 of the Montana statute (General Laws Montana, 1889, p. 140, substantially the same as our section 4778), which should be given some significance to prevent such unjust consequences to voters as have been explained, and which are impossible under the English ballot act, which that case purports to follow and expound.

Some other decisions, however, are supposed to cast light on the present discussion, and will, therefore, be touched upon.

In *Talcott v. Philbrick* (1890), 59 Conn. 472, the supreme court of Connecticut had to deal with a statute

so unlike the Missouri law that it does not even provide for printing the list of candidates at public expense; but it requires the secretary of state to furnish at cost (to all persons applying for them) blank slips of paper, of uniform size, color, etc., indorsed (in print) "official ballot," and upon these papers the respective politicial parties may cause the names of their own nominees to be printed, under provisions declaring that "in addition to the official indorsement the ballots shall contain only the names of the candidates, the office voted for, *and the name of the political party issuing the same*" (Public Laws, Conn. 1889, sec. 1, p. 155); and, further, that "all ballots cast in violation of the foregoing provisions, or which do not conform to the foregoing requirements shall be void and not counted." Same Act, sec. 12.

The case showed that some ballots, in a local election, had been issued by the Republican party, but were headed "*Citizens;*" yet so loth was the court to disfranchise a few persons, who had voted for an alderman in Hartford, that the ruling, pronouncing the "citizens" ballots illegal, was made by three judges only, the other two dissenting.

The exact value of such a decision in enlightening the case at bar we need not pause to measure. The reader can probably as well determine that for himself.

In *People ex rel. v. Board of Canvassers* (1891), 129 N. Y. 395, the statute required a certain uniform official indorsement on all ballots, cast at any one polling place, to preclude identification of any particular vote or class of votes, and declared that "no ballot that has not the printed official indorsement shall be counted." The facts were that certain ballots, having an indorsement different from others properly used at the precinct in question, were voted by twelve hundred and fifty-two electors; and the court rejected the ballots

mentioned, but only by the concurrence of four judges, three others dissenting.

We mention these cases neither to approve nor to disapprove them; but to indicate how inapplicable they are to the case in hand, and to show that, even with language as positive as that they construe, how reluctant are the courts to adopt an interpretation, the effect of which is to deprive a large number of their fellow-citizens of the electoral franchise.

Having regard to the spirit and purpose of the Missouri statute, and to the general principles governing the treatment of popular elections by the courts in this country, we think it should be held that where a candidate for public office causes no timely objection to be made before the election (as permitted by section 4778), he should be regarded as having waived all objections that may exist to the presence on the official ballot of any names of nominees not properly entitled to be there. Compare *Reg. v. Bradburn* (1876), 6 Ont. Pr. 308, and *Allen v. Glynn* (1892), 29 Pac. Rep. (Colo.) 670; s. c., 17 Col. 338.

II. It is next charged that the "Union-Labor" list of names of candidates was not legally certified to the county clerk.

How it was certified is not stated. That it was not certified at all is not alleged. From what appears it is evident that the pleader is giving merely his views of the certificate, of which neither the language, substance nor legal import is mentioned, so that the court cannot judge whether it was "legally certified" or not.

In addition, therefore, to the reasons already assigned for declining to review in this proceeding the alleged errors of the county clerk in preparing and printing the ballot, the application of a familiar rule of code pleading makes it unnecessary to discuss as a fact such

a legal conclusion as alludes to the certification of the "Union-Labor" ticket.

III. It is next asserted that the votes from Sedalia should be excluded because they were received at two polling places instead of at one.

It appears that the county court had designated Sedalia city as one election district, but had further provided two voting places therein for holding this election, with one set of judges at each, as hereafter more particularly described. This was done by orders to that effect before the election. Both of the voting precincts were at the courthouse in that city.

At one, the voters whose surnames began with the letters "A" to "K" voted; at the other, those with the letters "L" to "Z." Each poll was reached by way of a window, and the two were only seventy-five feet apart. The windows fronted on one portico of the court building. Through them, passways led to the polling booths in the rooms within, where the election judges were stationed and received the ballots.

Assuming that these arrangements involved the irregularity of receiving the vote at two places instead of at one, does it nullify the will of the people so expressed, the election having been regular in other respects?

Undoubtedly some irregularities are of so grave a nature as to invalidate the whole return of the precinct at which they occur; as, for example, the omission of registration. *Zeiler v. Chapman* (1874), 54 Mo. 502. In determining which are of that kind, the courts aim merely to give effect to the intent of the law-makers in that regard, aided by established rules of interpretation.

If the law itself declares a specified irregularity to be fatal, the courts will follow that command irrespective of their views of the importance of the requirement.

*Ledbetter v. Hall* (1876), 62 Mo. 422. In the absence of such declaration, the judiciary endeavor as best they may to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise it is considered immaterial.

It has been sometimes said, in this connection, that certain provisions of election laws are mandatory, and others directory. These terms may, perhaps, be convenient to distinguish one class of irregularities from the other. But, strictly speaking, all provisions of such laws are mandatory in the sense that they impose the duty of obedience on those who come within their purview. But it does not, therefore, follow that every slight departure therefrom should taint the whole proceedings with a fatal blemish.

Courts justly consider the chief purpose of such laws, namely, the obtaining of a fair election and an honest return, as paramount in importance to the minor requirements which prescribe the formal steps to reach that end; and, in order not to defeat the main design, are frequently led to ignore such innocent irregularities of election officers as are free of fraud, and have not interfered with a full and fair expression of the voters' choice.

Thus, in *Davis v. State ex rel.* (1889), 75 Tex. 420, the law required that each ward in a town should "constitute an election precinct;" yet, in San Marcos, a town incorporated with four wards, the county commissioners established two precincts only (without reference to ward lines), and each included parts of the adjacent country; but the court, after full discussion of the general subject, held that the election at those precincts was not avoided by the irregularity.

In *Stemper v. Higgins* (1888), 38 Minn. 222, a general election was conducted in the village of Madelia by its officers, as though it constituted a district separate from the township in which it was situated, where also a precinct was open; whereas the law declared that "every organized township, and every ward of an incorporated city, is an election district;" yet the court held the returns from the village valid, despite the irregularity indicated.

These cases find support in others, illustrating the same principle. *Gass v. State* (1870), 34 Ind. 425; *Dale v. Irwin*, (1875), 78 Ill. 180; *Wheelock's case* (1876), 82 Penn. St. 297; *Preston v. Culbertson* (1881), 58 Cal. 209; *Farrington v. Turner* (1884), 53 Mich. 27; and *Peard v. State* (1892), 51 N. W. Rep. (Neb.) 828, a case under a ballot reform statute.

Such rulings are not peculiar to election proceedings, but result, logically, from the application to them of a time-tested rule of interpretation which requires that the general design and object of a law be kept in view and effectuated, even if it be necessary, in so doing, to restrict somewhat the force of subsidiary provisions that otherwise would conflict with the paramount intent.   *Cortis v. Waterworks Co.* (1827), 7 B. & C. 330.

Elections under the "Australian ballot" statutes fall within reach of the principle above stated.

In the English law of 1872 it is enacted that "no election shall be declared invalid by reason of a non-compliance with the rules contained in the first schedule to this act, or any mistake in the use of the forms in the second schedule to this act, if it appears to the tribunal having cognizance of the question that the election was conducted in accordance with the principles laid down in the body of this act, and that such non-compliance or mistake did not affect the result of

the election." Ballot Act, 1872, 35 & 36 Vict., ch. 33, sec. 13, p. 200.

(The rules and schedules prescribe the forms of nomination papers, and the procedure for conducting the election.)

It has been judicially determined in that country that the language just quoted is merely declaratory of the common law of England. *Woodward v. Sarsons* (1875), 10 C. P. L. R. 751.

It certainly goes no further, as a curative power, than the accepted general principles of the law of elections in this country, as expounded by the courts.

We consider that they have a just and proper application to the facts now in judgment. It is not asserted, on this appeal, that the supposed irregularity, of having two voting booths instead of one, had any bearing upon the result of the election to the prejudice of plaintiff, and we are unable to conjecture how it could, in any wise, have redounded to his disadvantage. We believe it furnishes no sufficient reason for excluding the vote of the two precincts in the circumstances.

IV. We conclude that a reasonable and natural construction of the law forbids us to repudiate, for any such reasons as have been presented, the three thousand votes cast in Sedalia in 1890.

If for every error of a county clerk, or harmless irregularity in election procedure, citizens, having no control over either, are ¡to lose their right of choosing public officers, the "reform ballot act," instead of being found an improvement of the machinery of popular government, will justly be denounced as a "snare to entrap the unsuspecting voter." *Gumm v. Hubbard* (1889), 97 Mo. 319. Such a result, however, was never contemplated in its enactment, and should not be brought about by a narrow and technical reading of it.

"Where any particular construction which is given to an act leads to gross injustice or absurdity, it may generally be said that there is fault in the construction, and that such an end was never intended or suspected by the framers of the act." PECKHAM, J., in *People ex rel. v. Board of Canvassers* (1891), 129 N. Y. 395.

While it is well enough to insist on a proper and strict performance of duty by officers conducting elections, we are not of the number of those who imagine that such performance will be promoted by disfranchising the whole body of electors in any locality where errors, such as are here charged, occur. The legislature has not plainly declared such a purpose, and we think it should never be imported into a statute by construction.

It seems to us, after full reconsideration of the case, that the decision of Judge FIELD on the circuit, in favor of defendant, was right, and should be affirmed. BLACK, BRACE and MACFARLANE, JJ., concur; SHERWOOD, C. J., and GANTT, J., dissent. THOMAS, J., will express his views in a separate opinion.

GANTT, J. (*dissenting*).—At the general election held on the first Tuesday in November, 1890, Ellis R. Smith was the Republican candidate for sheriff, and Josiah A. Bowers was the Democratic candidate.

This is a proceding under the statute by which the appellant is contesting the election of the respondent. The contestor gave notice of the contest as required by statute, as did also the contestee. After the contest was begun, under a provision of the statute a re-count was had which gave the contestee Smith a majority on the face of the county clerk's count of thirty-three.

The abstract showed the vote as follows, for the whole county:

For Bowers............................. ..........................-. .......... ...... 3289
For Smith..................... .... .......................... 3332
For Sappington ................................................ 65
For No vote ............................. ......................... 197

Total ..................................... ...................... 6873

The abstract of the vote of the city of Sedalia was as follows:

|  | Bowers. | Smith. | Sappington. | No vote. |
|---|---|---|---|---|
| Sedalia City, A to K..... .... | 618 | 852 | 19 | 93 |
| Sedalia City, L to Z .......... | 654 | 840 | 13 | 71 |

Total... ................................................. 3160

Various grounds were assigned in contestor's notice but after the re-count the parties virtually stipulated to withdraw all charges of lack of qualification of the various voters, and all charges relative to illegal voting.

The remaining objections are contained in the fifth and seventh grounds of notice, which are as follows:

"*Fifth.* That said general election, on November 4, 1890, was legally conducted in the city of Sedalia in said Pettis county, in this, that notwithstanding the said city of Sedalia on said day constituted by a single voting precinct with fixed boundaries, yet during the whole of said day and during the whole time of election on said day two separate and distinct polling places were maintained by different sets of judges and clerks of election within the limits of said voting precinct in said city, and votes were received during said day and said election at both of said polling places by the respective sets of judges in charge thereof, and the votes so received at both of said polling places were afterwards certified by the respective sets of judges and clerks of election of said two polling places to the county clerk of said Pettis county, and which votes so certified were afterward included by said county clerk

and the two justices of the peace, called in by said clerk, in the official count of the votes cast at said general election in said Pettis county, all of which was and is contrary to the law of this state, and by reason whereof the said votes so certified from said city of Sedalia should have been and should be wholly excluded from the official count of the votes cast in said county at said general election."

"*Seventh.* That in said city of Sedalia in said Pettis county the said general election was required to be conducted under the provisions of article 3, chapter 60, of the Revised Statutes of Missouri, 1889, and that on November 4, 1890, said general election was not conducted in the manner required and as provided in said article of said chapter, in this, that the only tickets furnished to the voters and electors at said election in said city of Sedalia and required to be used by them in voting at said election were illegal, and did not conform to the provisions of said article of said chapter, but on the contrary were prepared, printed and furnished in violation of said statute. And among other reasons said tickets were illegal, because the said tickets so furnished and required to be used and voted at said election contained a list of candidates for various offices under the heading of 'Union-Labor,' of and among which said list was the following: 'For sheriff, G. D. Sappington,' and which said list of candidates under the said heading was printed upon and made a part of said tickets without any authority therefor, and contrary to the provisions of said statute for the reasons:

"*First.* That there was not at the time of said election nor on or within sixty days prior thereto any political party within said Pettis county having or being known by the name of 'Union-Labor' or any other similar name, or any name of similar import, which had at the last general election in said county

before said general election in 1890 polled as a party at least three per cent. of the entire vote cast in said Pettis county at such prior election, and said list of names of candidates was not legally certified from any convention of a political party, having the right in law to certify the nomination of candidates to be inserted in the tickets to be used and voted in said city of Sedalia at said general election in 1890.

"*Second.* That said list of candidates was not nominated as provided by law, and their alleged nomination was not certified by a certificate of nomination signed by electors resident within the said city of Sedalia, nor by electors resident within the said county of Pettis to a number equal to one per cent. of the entire vote cast at the last preceding general election in said Pettis county prior to said general election in November, 1890.

"*Third.* That the alleged nomination of said list of candidates and of each of them so printed on said tickets under said heading of 'Union-Labor' was not made or certified to the clerk of the county court of said Pettis county, by filing a certificate of nomination executed with the formalities prescribed for the execution of an instrument affecting real estate, and no certificate of nomination of said candidates or of any of them, executed with the formalities prescribed for the execution of an instrument affecting real estate, was filed with the clerk of the county court of Pettis county, Missouri.

"For which reasons the votes cast in said precinct in and for the city of Sedalia were and are illegal, and should have been, and should be, wholly excluded from the official count of the votes cast at said general election, in November, 1890, in said Pettis county."

The contestee filed a motion to strike out of the contestor's notice the fourth, fifth and seventh para-

graphs which alleged respectively that the ballots in the Sedalia precinct were counted contrary to law, and that *two* polling places were maintained in said precinct, and that the official ballot illegally contained the names of the candidates of the Union-Labor party. This motion was sustained, to which action appellant duly excepted at the time.

On the trial of the case the contestor offered in evidence one of the official ballots, which were cast at the election in question, and also read in evidence the county clerk's abstract of the votes cast for the parties at such election as ascertained by the re-count. The court refused, against the objections and exceptions of the contestor, to admit evidence showing that the city of Sedalia at the time was a city with over five thousand inhabitants. The court then admitted evidence showing that the one hundred and sixty-four votes in the Sedalia city precinct referred to in the county clerk's return of his official re-count as "no votes" were so returned because the majority of said ballots were not counted for either of the three candidates for sheriff by reason of the fact that the name of only one of the same was crossed out leaving the names of two candidates voted thereon for such office. The court next refused evidence offered by the contestor to show that two polling places were held in the Sedalia city precinct *with two sets of judges, clerks, poll-books and ballot-boxes.* And contestor offered evidence in connection therewith to show that in one of said polling places all voters the initial letter of whose last name fell between "A" to "K" inclusive were required to vote at one polling place, while in a like manner all between "L" to "Z" voted at the other polling place, but that the poll-books showed about fifty exceptions to the rule, voters to that number having voted at the wrong places under such arrangement. That at each of said polling places there

were six judges, two of whom had charge of the ballots and issued them to the electors. At each place the judges numbered the ballots on the back to correspond with the number of the voter casting the same at the poll. That these polling places were seventy-five feet apart, all of which evidence was on motion of contestee excluded by the court, to which appellant duly excepted.

At the close of the contestor's case, the contestee offered in evidence his certificate of election, and his commission, and rested, and the court thereupon rendered judgment for the contestee.

In due time, the contestor Bowers filed his motion for new trial, assigning as error the sustaining of contestee Smith's motion to strike out parts of contestant's notice and striking out said paragraphs (fourth, fifth and seventh) and excluding legal and competent evidence. This being overruled, the cause was appealed to this court.

The trial court excluded evidence tending to prove that the city of Sedalia was a city having over five thousand inhabitants on the date of the general election in 1890. If the trial court refused to hear this evidence on the ground that it would take "*ex-officio*" notice of the population of Sedalia, its ruling might be sustained; otherwise it was error to decline to hear it. By section 4794, article 3, chapter 60, only applied to cities of five thousand inhabitants. It was most material to know whether that article applied to the contest. It is, however, conceded by both sides here that said city has a population largely in excess of five thousand. Under these circumstances, article 3 of chapter 60, Revised Statutes, 1889, was applicable to the method of holding and conducting said election in said city.

I. The contestor insists that the vote of the city of Sedalia should be rejected altogether, because the

Bowers v. Smith.

official ballot prepared by the county clerk and used at that precinct contained in addition to the names of the Democratic and Republican nominees, duly certified to the county clerk, the names of certain parties as candidates of the Union-Labor party, among others, that of George D. Sappington, for sheriff, when, in fact, no such party at the last previous general election had cast three per cent. of all the votes of Pettis county, and no nominations of such a party had been certified to, or filed with the county clerk as required by said article 3 of chapter 60.

This, it will be readily seen, presents a question of great moment. The right of suffrage is justly esteemed the corner stone of our free institutions. Our election laws are framed with the special purpose of preserving this right, and of enabling every citizen, whatever his position in society, to express his choice, untrammeled and unintimidated. It is earnestly contended by counsel that, if the statute is to be construed so that ballots cannot be counted which contain names of candidates prohibited by the statutes, then it is unconstitutional. The argument of counsel for contestee is based upon the wrong that would be done the voter to deprive him of his franchise on account of the illegal act of a public officer, and that the statute is merely directory and not mandatory.

The right to make laws to preserve the purity of elections is expressly conferred on the legislature in some of the states by their constitutions, but, in Missouri, the power to regulate elections by law has never been doubted or denied. In the administration of these laws, individual instances doubtless will occur when the voter loses his ballot, but this is no greater hardship than befalls the individual in the administration of other general laws.

In *State ex rel. v. Cook*, 41 Mo. 593, where the whole vote of an election district was thrown out by the court of appeals, because the officer making the registration was disqualified to act, this did not give a party who was a qualified voter, and who was registered as such, the right to demand that he should be entered as a qualified voter in preparing the list of voters for a special election. The court held that it was a case of great hardship and deprivation. A citizen who had fought in the armies of his country, who was a qualified voter according to law, and had complied with all the forms of registration, was denied the privilege of voting because the board of revision pronounced the book in which he was registered a nullity, and the law had failed to provide for a new registration. Judge WAGNER, speaking for the whole court, said: "But it is better that he should be deprived of a right temporarily, than that this court should overstep the boundaries of established precedent and sound construction and annihilate the line which separates judicial from legislative functions."

"A court of law," says Lord ABINGER, "ought not to be influenced or governed by any notions of hardship; cases may require legislative interference, but judges cannot modify the rules of law." *Rhodes v. Smethurst*, 4 M. & W. 63. "It is not for courts of justice *'proprio marte'* to provide for all the defects, or mischiefs of imperfect legislation." Per STORY, J., in *Smith v. Rines*, 2 Sumn. 354.

In *West v. Ross*, 53 Mo. 350, in a statutory contest for the office of clerk of the circuit court of Gentry county, the statute required that all ballots cast should be numbered, and that ballots not numbered *should not be counted;* it appeared that none of the votes cast in Miller township were numbered by the judges of the election; that Ross received in said township one

hundred and seventy nine votes, and West seventy-two votes. It was further shown that the majority for Ross in the whole county, over West, was eight; that, if the votes in Miller township which were not numbered had not been counted, West would have had·a majority of ninety-nine votes over Ross. *It was also admitted that no fraud was intended by the judges in failing to. number the ballots.* In that case it was contended that the statute requiring the ballots to be numbered was *merely directory.* Judge VORIES says: "After the legislature by the statute directs that the ballot shall be numbered, it proceeds to declare the consequences of a non-compliance with the direction, which is that 'no ballot not numbered shall be counted.' Can we say that this negative clause is *only directory*, and in that indirect way nullify, or repeal by a judicial decision, the whole provision of the statute requiring ballots to be numbered? If *we deny* the consequence affixed by the legislature to the non-performance of a regulation provided by the law, it, in effect, nullifies the law itself. * * * This case may be a hard case, and doubtless is; *but the legislative enactment is clear*, and, although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk *at one election*, it is better that they should suffer this temporary privation, than that the courts should *habituate* themselves to disregard or ignore the plain law of the land in order to provide for hard cases."

The same statute received the same construction again in *Ledbetter v. Hall*, 62 Mo. 422.

In *State ex rel. v. Frazier*, 98 Mo. 426, the special act of the legislature, incorporating the city of Rolla, required that the voters at city elections "shall register their names at least two weeks next preceding the election." A city election was held, and certain citizens elected councilmen. The election was held in every

respect in compliance with law, save the voters, were not registered. BARCLAY, J., said: "There was, in this case, a total failure to comply with a law making the registration of voters *an essential preliminary* to an election," to the fullest extent; that it is peculiarly the province of the legislature to prescribe the rules and regulations for conducting elections in this state; and that when the law prescribes certain requisites in the ballot, and follows it with the denunciation that unless the ballot complies with the law "it shall not be counted," then the statute is mandatory, and a non-compliance therewith will avoid the election.

Now section 4772 provides "except as in this article otherwise provided, it shall be the duty of the clerk of the county court of each county to provide printed ballots for every election for public officers in which the electors or any of the electors within his county participate, and to cause to be printed in the appropriate ballot the name of every candidate *whose name has been certified to or filed with him in the manner provided for in this article. Ballots other than those printed by the respective clerks of the county courts, according to the provisions of this article, shall not be cast, or counted in any election.*"

Section 4773 provides that "every ballot printed under the provisions of this article shall contain the name of every candidate whose nomination for any office specified in the ballot has been certified or filed according to the provisions of this article, *and no other names.*"

For the purposes of this discussion, it must be taken that the motion to strike out the allegations in the notice as to the names of the Union-Labor candidates confesses the truth of that averment; which I hold is a clear and concise statement, and its sufficiency as a pleading was not questioned by opposing counsel in the circuit or this court. It was reserved for this

court to make the point; and it stands admitted that the ballot contained names not certified or filed in accordance with said article 3 of chapter 60. The statute provided said ballot should contain "no other names" than those certified. Here then is a positive violation of a plain law. What penalty follows in such a case? The statute answers, "Ballots other than those printed * * * *according to the provisions of this article (3) shall not be cast or counted in any election.*" These words *"shall not be counted"* were construed as mandatory in *West v. Ross*, 53 Mo. 350, and the whole vote of a township excluded. Again in *Ledbetter v. Hall*, 62 Mo. 422, the whole vote of a township was excluded under the same provision.

In *Gumm v. Hubbard*, 97 Mo. 311, it is true, the words, "shall be considered fraudulent," were in the statute, but the words, "and shall not be counted," affixed the punishment, that should be visited upon the ballot, declared by the statute to be fraudulent.

The alternative is plain, we must either follow a statute which the legislature has enacted, and had a perfect right to enact, or hold that it is optional with the county clerks to obey the election law or not, as their judgment may dictate. By holding that a violation of this provision does not affect an election, we in effect nullify the statute, and say to election officers, it is not necessary to follow its commands.

But it is argued by contestee that no fraud on the part of the clerk or of respondent is charged.

In *West v. Ross*, it was expressly admitted, the judges were guilty of no fraud in failing to number the ballots, yet that did not prevent this court from declaring the election void.

In *Gumm v. Hubbard*, Judge BLACK says the statute furnishes an absolute rule of evidence. It makes the ballot fraudulent *without regard to intent*. So it

would seem that neither averment nor evidence of fraud is necessary in such cases, but proof simply of a failure to comply with a mandatory provision of the statute *will avoid the election.*

In 6 American & English Encyclopedia of Law, page 348, section 8, it is said: "In many of the states there are statutes prescribing the form of the ballots, the kind of paper, etc., and prohibiting any marks, figures or devices by which one can be distinguished from another. These statutes being designed to preserve the secrecy of the ballot, and to prevent fraud, intimidation and bribery, will generally be considered mandatory, *and this will be so in all cases* where the statute provides that a ballot varying from the requirements of the law *shall not be counted.*" And at page 325 of the same volume it is said: "A violation of mandatory provisions will avoid the election *without regard to the motives* of the persons guilty of the violation and without any inquiry into the effect of the result of the election."

Again it is said no harm was shown to have resulted to contestor. It appeared from the evidence in the trial court that, upon the re-count, contestee Smith had a majority of thirty-three votes only. It further appeared there were one hundred and sixty-four votes cast in Sedalia that were returned as "no votes." "In about three-fourths of said ballots the state of the case was that the same were not counted because one of the three candidates for sheriff was scratched leaving the other two upon the ballot, and in a very large majority of such three-fourths of said ballots the aforesaid result arose from the fact that the voter struck out one column of candidates, or the candidates of one political party, and left the candidates of the other two parties or columns intact." Now according to the statutes of this state, as only the nominees of two political parties had been certified to the county

clerk, no other names could lawfully be placed on the ballots at said election, and had there been only the two names of the contestor and contestee on the official ballot the striking off of either of their names would have left the other a vote, but when a third name illegally appeared on this ballot the striking off of the name left a vote for two candidates, which rendered it void, or "no vote." There were one hundred and sixty-four votes of this character in Sedalia alone, and the majority is only thirty-three. Who will say that the placing of the third name illegally on these ballots did not render this election uncertain? It has often been said that, if the irregularities in an election are so great as to render the choice doubtful, they will avoid the election. *Scranton Borough case*, Brightly's Election Cases, 455; 6 American & English Encyclopedia of Law, 328, note 3.

But it is argued that the constitution secures to every voter the right to cast his ballot for whom he pleases. Certainly this is not denied, and, in order that he may not be restricted simply to those candidates whose names are printed on the official ballot, it is expressly provided in section 4773 that "at the end of the list of candidates for each office shall be left a blank space large enough to contain as many written names of candidates as there are offices to be filled." We agree with counsel for appellee that if this new election law of May 16, 1889, should restrict the election to the names printed on the official ballot, and made no provision for his substituting any name he chose for any office to be chosen it would be unconstitutional. On the contrary, it has expressly guarded against that in section 4773 by leaving space for him to write the names of as many candidates as there are offices to be filled.

But we are not certain that we fully comprehend the objection that this act is unconstitutional, if it is construed that a ballot shall not be counted if it contains written matter not authorized by the statute. The term, "elections shall be free and open," is very general. If by it we are to understand that the citizen may defy all regulations prescribed by law; call and hold elections whenever he sees fit, and vote in any manner that may suit his fancy, then all election laws are unconstitutional. But we hold that "the elective franchise is not an unrestrained license. In a government of law the law must regulate the manner in which it is to be exercised. The time, occasion and *mode* of *voting* are to be prescribed by the legislature in subordination to the provisions of the constitution." Paine on Elections (1888), sec. 5. A careful scrutiny of this act has not revealed anything in the provisions requiring the county clerk to print the ballots, and prescribing what names shall be printed thereon that in our opinion conflicts with the free and open election.

If an aspirant for office does not belong to any of the great parties in this country, and is not fortunate enough to have the nomination of a party that cast three per cent. of the votes at the last election, he is still not debarred; he can procure the certificate of electors within his district or political division to the number equal to one per cent of the vote cast at the last general election. This system contains many features that are new, and they have not yet received construction by the courts of the several states. In *Price v. Lush*, 24 Pac. Rep. 749, the supreme court of Montana held that as this was an English statute, and had been often construed by the courts of that country, the territory of Montana must be presumed in adopting it to take it with the construction it had received in

England, and consequently held an election void where the successful candidate at the polls had not been nominated as required by law, but had succeeded in getting his name on the official ballot. That court reached that conclusion after a thorough examination of the English and Australian cases. In adopting that construction, it followed eminent authority. *Pennock v. Dialogue*, 2 Pet. 1; *McDonald v. Hovey*, 110 U. S. 628; *Allen v. Bank*, 120 U. S. 34; *Pratt v. Tel. Co.*, 141 Mass. 225; *Skouten v. Wood*, 57 Mo. 380.

But the power of the legislature to regulate elections has been elaborately reviewed by the court of appeals of New York very recently in the case of *People ex rel. v. Board of Canvassers*, 29 N. E. Rep. 327.

The Australian ballot system, with some modifications, was adopted by the legislature of that state in 1891. The title of the act was "An act to promote the independence of voters at public elections, enforce the secrecy of the ballots and provide for the printing and distribution of ballots at public expense." Laws of 1891, N. Y., ch. 296.

Section 31 of the act provides that "no inspector of election shall deposit in a ballot box or permit any other person to deposit in a ballot box on election day any ballot which is not properly indorsed and numbered except in the cases provided for in section 21 of this act." Section 17 of the act required this indorsement "official ballot for ———," and it was provided that after the word "for" in the blank should follow the description of the polling place for which the ballot is prepared, the date of the election and a fac-simile of the signature of the county clerk, and the ballot shall contain no caption or other indorsement.

The town of Camillus, in Onondago county, was divided into two election precincts. In some way it turned out that all the Republican ballots in district

number 1 in said town were indorsed "official ballot for *second district poll,* town of Camillus," November 3, 1891. And in district number 2 all the Republican ballots were indorsed for *first district.* There were twelve hundred and fifty-two of these ballots. The inspectors counted these ballots for Rufus T. Peck, Republican candidate for senator. A proceeding by *mandamus* was begun in the supreme court to require the canvassers to reject these ballots as illegal, and the writ was made peremptory in that court. On appeal to the court of appeals that order was affirmed. Opinions were written by RUGER, C. J., Judges GRAY and O'BRIEN, in which the decisions of this court in *West v. Ross, supra,* and *Ledbetter v. Hall,* 62 Mo. 422, *supra,* were quoted and approved. These opinions with one accord all hold that as "the act provides that no ballots not properly indorsed shall be received, or if received shall be counted," it is imperatively the duty of the canvassing officers to reject them.

Says RUGER, C. J.: "But it is urged that a strict construction of the law must result in disfranchisement. This is true, but the law plainly contemplates such a result, and who can complain except those who are opposed to any restrictions whatsoever upon the action of an elector? No advocate of the reform ballot law can justly criticise a result which was in the minds of its authors when the law was drafted and enacted. They clearly contemplated this effect, and determined that the injustice which a few might suffer through ignorance, wilful blindness or inattention to the requirements of law should not be permitted to defeat the great good to be secured to the whole people by the adoption of an effectual scheme for the purification of elections."

Let it be conceded that the arguments of the judges in sustaining the law proceed principally upon the necessity of a secret ballot, and to permit the irregularity to go unpunished would destroy that secrecy, still the great underlying consideration was that "elections are a contrivance of government, which prescribes who are electors, and how they may express their will, and it is a legitimate exercise of power to prescribe the description of ballots which shall be used."

This case fully meets the argument of respondent, that the ballots in the case at bar were official ballots prepared by the county clerk, and his illegal act cannot disfranchise a voter. In the New York case the ballot was indorsed "official ballot," but by the wilful or negligent act of the clerk the wrong precinct was indorsed, and they were rejected. The point is identical in principle. It was the act of an official, and that court, as we have already said, but followed our own decisions, *supra*, wherein the act of the election judges disfranchised a whole township.

The supreme court of Connecticut in *Talcott v. Philbrick*, 59 Conn. 472; 20 Atl. Rep. 436, had a question identical in principle with this. There, as in Missouri, this Australian ballot system was adopted in 1889. By the first section of chapter 247, page 155, "Acts of Legislature, Connecticut, 1889," it is provided among other things, "in addition to the official indorsement, the ballots shall contain only the names of the candidates, the office voted for, *and the name of the political party issuing the same.*" And section 12 provided that "All ballots cast in violation of the foregoing provisions, or which do not conform to the foregoing requirements, shall be void *and not counted.*" Certain ballots, two hundred and eighty-six in number,

bearing the names of all the Republican candidates and in every respect complying with the law, save and except they bore the name "citizens," were cast at that election. These ballots were issued by the Republican party. The court held these ballots were void, and should not be counted.

Says the court: "We are relieved of any obligation to inquire as to the necessity or reason of this or that requirement, and we are not at liberty to dispense with anything that is required, whatever the reason for it may be, or even if without any apparent reason at all. The legislature has spoken, and obedience is our first and only duty. It is at liberty to throw around the ballot box such safeguards and regulations as it may deem proper, and it is the duty of the citizen to conform thereto. Some inconvenience is not too great a price to pay for an honest pure ballot." And as applicable to the notice of contest in this case the court says: "The ballot does not speak the truth. It purports to have been issued by a Citizens' party, but it was in fact issued by the Republican party; it implies that there was a Citizens' party, but there was not." In this case, the ballot implies there was a Union-Labor party, but the motion to strike out confesses there was not; and yet the names of candidates of such a party were placed on this so-called official ballot to mislead and confuse the voter, and actually had that result.

In *Fields v. Osborne*, 21 Atl. Rep. 1070, this same Connecticut statute again came under review. This was an annual election for the town of Branford. Among other offices to be filled was that of *"town clerk."* By the statutes this office is *"ex officio"* the registrar of births, marriages and deaths in their respective towns. No vacancy existed, and by law no election for probate judge was authorized at this election. There were two tickets in the field. The Demo-

Bowers v. Smith.

cratic ticket and a "Citizens' ticket."   On the Citizens ticket were the words:   "For judge of probate, Henry H. Steadman."   On the Democratic ticket were the words:   "For town clerk, and *ex officio* registrar of births, marriages and deaths."   The court held that the Citizens' tickets, containing the "judge of probate," were illegal and should not be counted, and also rejected the Democratic tickets with the words, *"ex officio registrar,"* etc.   Judge SEYMOUR, delivering the opinion, says:   "A plain provision of the law is violated in a point concerning which the act does not authorize us to inquire into the intent or the consequences of the violation.   In short, the legislature has seen fit to say if a ballot contains the addition to the specified contents which these do it shall be void.   Unless we are prepared to hold the act unconstitutional we cannot disregard its requirements.   If it is harsh and unreasonable, the remedy is with the legislature that enacted it, and not with the courts, which are bound to respect it."   See, also, *In re Vote Marks*, 21 Atl. Rep. (R. I.) 962.

The act of 1889 was confined to cities of five thousand inhabitants.   It was an experiment.   The legislature apparently hesitated to adopt it for the state at large, lest its requirements might confuse the officers and voters, but the city elections demonstrated that it was not difficult to comply with it, and it rapidly won the public favor so that the present legislature has applied its provisions to every precinct in the state. Except for the gravest reasons we ought not to set aside the plain mandate of the legislature, but if we permit the plain violation of that law that was committed in this case we nullify the statute.

But it is objected, that, notwithstanding the county clerk placed upon the ballots at this election the names of candidates in positive violation of the statute, the

contestor cannot complain, because section 4778 provides "whenever it shall appear by affidavit that an error or omission has occurred in the publication of the names or description of candidates nominated for office, or in the printing of the ballots, the circuit court of any county, or the judge thereof in vacation, or if the circuit judge is then absent from the county a judge of the county court, may, upon application by any elector, by order, require the clerk of the county court to correct such error, or to show cause why such error should not be corrected." This section was intended to correct mistakes in the names of the candidates *nominated* or the designation of the offices for which they were candidates, upon the application of any elector. It does not purport, nor do we think it was intended as furnishing a mode of procedure to a candidate who was wrongfully denied a place on the ticket, nor a remedy for those lawfully on the ticket, to purge it of names which had illegally been placed thereon. But, in any event, this case is here on the pleadings alone. There is nothing in the record that tends to show that contestor had any knowledge of the facts, which would now estop him of complaining. In the absence of proof or allegation to the contrary, it will be presumed that he acted on the presumption that the county clerk, a public officer, would not put on the official ballot the name of any candidate whose nomination had not been certified or filed as required by law. In the absence of knowledge, no one will contend he is estopped.

II. Again it is contended by the contestor Bowers, that the vote of the Sedalia precinct should be excluded, for the reason, that the county court ignored section 4673, in the appointment of judges of the Sedalia precinct.

The statute, section 4777 in connection with 4673, provides that the court shall appoint six judges for each

precinct, and in this instance the court appointed twelve judges. Instead of one polling place in the precinct, there were two, seventy-five feet apart. Different judges received and numbered the ballots. At one of these voting places fifteen hundred and eighty-two votes were cast, and at the other fifteen hundred and seventy-eight. By the statute, section 4777 in connection with 4673, the county courts are empowered to appoint six judges only for each election precinct; three of the judges shall be selected from the party having the largest vote at the last election, and three from the party having the next largest. These judges shall select the two judges, one from each party, to have charge of the ballots and furnish them to the voters. And minute direction is given in the statute for the conduct of the election. There is no warrant for the appointment of double this number and opening a new poll. After the court had appointed six, the power of attorney was exhausted, and those appointed after that derived no authority.

If the county court of Pettis county may disregard the election law by appointing six additional judges and a second polling place, they may establish a dozen in the same precinct, and if that court may do this all other county courts may do likewise. The precedent would be dangerous and pernicious. It would open wide the door for fraudulent practices, and practically nullify the statute. Counsel for contestee says: "Certainly some of the judges acted legally, and how can it be decided as to which lot of ballots shall be thrown out, and which body of electors deprived of their votes?" We answer that where the conduct of the election is so grossly irregular that the courts cannot determine which are legal and which illegal, the whole should be disregarded. In no other way can the laws be upheld, and the purity of the ballot preserved.

As to the provision of the statute, we think there is little trouble in ascertaining the reason upon which it rests. Observation and experience have taught that one of the greatest evils attending our popular elections has been the crowding of the polls. In this way the not over-scrupulous partisan manages to delay voters, deter the timid and diffident voter, annoy the judges with frequent and unfounded challenges and other interruptions, and block the way for all but his own party. To avoid this the statute is ampler in its authority to the county court to make the precinct or election districts small enough that six judges only will be required to receive and count the vote. The county court of Pettis county, when it appointed twelve judges for one precinct, by its very record, disclosed the absolute necessity for dividing this precinct. It is a virtual finding that six judges could not receive and count the votes. Instead, in that city, of their following the plain provisions of the statute and dividing the precinct, they made this unauthorized appointment of six additional judges, and in this way preserved all the objectionable features of a popular election, and secured to the people of that city none of the benefits that the statute was designed to secure. The statute wisely provides that each voter shall vote only in the township in which he resides, or, if in a town or city, then in the election district therein in which he resides. This provision was made so that the judges and voters could more readily know who is entitled to vote, and the more easily detect any attempt to vote illegally, either from want of residence or non-age, or other disability. McCrary on Elections, sec. 651. Moreover, by having precincts small enough for two judges to receive, and two to count, the judges may more deliberately hear challenges and decide them, without denying others the right to vote. Judge

McCRARY, in his work on elections, expresses the opinion that no precinct should contain over three hundred voters; indeed, he lays it down as a cardinal principle, that multiplication of voting precincts will prove an effectual remedy for all the evils that flow from overcrowding the polls.

And there are other considerations that doubtless controlled the legislature. It was intended that the boundaries of each precinct should be defined, and every elector therein should know the voting place. It was never intended, as was done here, that the initial letter of a voter's name should subject him to the annoyance of going from one voting place to another according to the initial letter of his name. It was the clear intention of the law that every voter in each precinct should vote at one and the same place, and that these precincts should be small enough to permit each voter to cast his ballot on the day of election without annoyance. The suggestion that this had been previously done is not in the case, and if it was is no justification. There was no evidence heard on this branch of the case that would tend to estop the contestor.

As the judges in excess of six were not even *"de facto"* judges, it resulted that at least six persons unauthorized by statute were permitted to pry into the ballots of the voters, and thus destroy that secrecy which the constitution secures against every one but a sworn and lawful election officer. The position taken by my learned brother, that the two polling places within one precinct is not an abuse of the statute, is not sustained by those judges of this court who hold that this violation of a positive enactment does not vitiate the election.

The case from the supreme court of Texas in *Davis v. State ex rel.*, 12 S. W. Rep. 957, is cited as authority. But the facts in that case show that the

county court made the mistake of putting two wards in one precinct, and only appointed one set of officers for each precinct.

I presume I may be permitted also to cite the *dissenting opinion* of Judge HENRY, 12 S. W. Rep. 962, as furnishing to my mind the most satisfactory reasons why the election in that case should have been held void. I quote from his opinion: "The doctrine of *de facto* election precincts finds no place in the law. What is unlawful for the commissioners' court and the voter to do in the first instance, cannot become right or lawful by being repeated. The law, much less the constitution, cannot be repealed or superseded by such methods. * * * The law does not, however, authorize two separate elections to be held in one ward or any other election precinct. It directs and authorizes one only. For the purpose of preventing fraudulent voting, the policy of the law is that there shall be only one poll, at which one person can cast his vote."

I am glad that the judgment of this court does not at least approve the clear violation of the law in appointing *two sets* of election judges in one precinct, and that in the future the county court will avoid this clear violation of the spirit and letter of the law. This appeal will accomplish this much good, if no more.

I cannot give my assent to the opinion of the majority.

I understand that the legislature has a right to enact laws regulating elections, and that it is the duty of the courts and the citizen alike to obey them, so long as they do not infringe upon the constitution.

When the legislature adopted what is popularly known as the Australian ballot law, its purpose was most clearly to throw around the voter and his ballot additional safeguards and render him less liable to be

deprived of his suffrage. All good citizens appreciate the importance of preserving the ballot in all its purity, the only difference that can arise *is as to the method of so doing.* We hold that the most effectual way of accomplishing this is to require these election officers to *obey the statute.*

It follows from these views that I hold the ballots containing the names of the Union-Labor candidates void, and that the dividing of the city into two polling places was illegal and unauthorized, and resulted in placing the ballots in the hands of parties who had no authority to see them, and was a clear violation of the statute. In so doing, I follow the command of the law in a matter of the highest public concern.

The judgment of the circuit court should be reversed, and the cause remanded for trial in accordance herewith.

I am authorized by Chief Justice SHERWOOD to say he concurs fully in all I have said, and THOMAS, J., concurs in the result I would reach.

THOMAS, J. *(dissenting).*—I concur in the result reached by my brother GANTT on the second point discussed in his opinion, but I fear he has stated the principles upon which he bases that result too broadly. I am not prepared to say that a county clerk's action in preparing a ticket under our election laws can be reviewed by the courts after the election in *all* cases, nor am I willing to say that it cannot be reviewed in *any* case. That would, in my judgment, depend on circumstances.

Under the specifications in the notice of contest in this case which were stricken out on motion of the contestee, the contestor would have had the right to introduce evidence to show that the Union-Labor party had no existence in Pettis county; that Sappington had not

been nominated by any party, or by any number of electors; that his nomination had not been certified to the clerk at all, and that the clerk arbitrarily put his name on the official ballot without deciding or attempting to decide anything, simply because he was requested to put it there, and in that case the ballot would have been void.

I fully concur in what was said by SHERWOOD, P. J., in division number 1, in *State ex rel. v. Lesueur,* 103 Mo. 253, that the secretary of state does not occupy "the attitude of a mere figurehead or automaton, moved about at the whim or touch of every eager applicant who desires the performance of duties which pertain to his office. When applied to for the discharge of such duties, although his discretion may not reach the height known as *judicial,* * * * yet it cannot be doubted that some portion of the qualities and attributes of discretion necessarily inhere in the discharge of his official duties, requiring him to consider before acting, and to search and inquire before reaching and announcing a conclusion."

These remarks are as applicable to the county clerk under our election statutes as to the secretary of state, but I do not believe the power of the secretary of state or clerk in preparing the official ballot *is unlimited.* It would be a pernicious doctrine for the courts to assert that the county clerk can arbitrarily and *ad libitum* put names on the official ballot that ought not to be put on it, and that the candidates who have a legal right to have their names on it must resort to the courts before the election or lose their remedy. On the other hand, if the clerk should receive the certificate of nomination, should examine into the facts in regard to it, should decide that the names of the parties mentioned therein ought to go on the official ballot, and should print and publish it as required by law, and no objection to it

Bowers v. Smith.

should be made prior to the election, the courts, in a contest arising in regard to it after the election, might very well refuse to interfere with the clerk's decision and hold the ballot good, though it should turn out that certain names were improperly printed on it. But the courts should hold the ballot void if it appears that names were illegally printed on it, unless it should be proved that the clerk did consider before acting, and that he did search and inquire before reaching a conclusion; that he did exercise his judgment and discretion, and that he did not arbitrarily, and without a pretense of authority or right, print the unauthorized names on the ballot.

I take the position that the clerk has not a *carte blanche* to put the name of every eager applicant, who may so request, on the official ballot, nor should a ballot be declared void in every case in which a name is on it which ought not to be on it, where the clerk exercised a sound discretion in preparing it. This leaves the courts to review the action of the clerk, and to adjudicate the issue as the very right of each case may demand.

The court below ought to have refused to strike out the portions of the notice of contest it did strike out; ought to have heard the evidence in regard to how and why the names of the Union-Labor candidates were printed on the ballot, and to have disposed of the issue on the evidence.

I fully agree with my brother BARCLAY in what he has said in his opinion in regard to the election precincts in Sedalia. For the reasons given above, I think the judgment of the lower court ought to be reversed, and the cause remanded for new trial on the merits.