(December 30, 1895.)

# BAKER v. SCOTT.

[43 Pac. 76.]

ELECTION LAW—CORRECTION OF OFFICIAL BALLOT—TOO LATE AFTER
ELECTION.—Where a candidate for a county office neglects to have
an alleged defect in the official ballot corrected as provided by
section 59 of the election laws of this state, he cannot, after the
election is had, and he finds himself defeated, raise the objection
that the name of the successful candidate was improperly placed
upon the official ballot.

(Syllabus by the court.)

APPEAL from District Court, Bannock County.

Attorney General George M. Parsons, Fremont Wood, S. C.
Winters, D. C. Lockwood, Stewart & Dietrich and Edgar Wilson, for Appellant.

This was an action to contest the election of John Scott,
respondent, to the office of clerk of the district court in and
for Bannock county. It appears that John S. Baker was regularly nominated on the Republican ticket for said office and
that John Scott was the regular nominee on the Democratic
ticket for said office and that John Scott was placed on the
official ballot as the nominee of the People's party and the Taxpayers' party. The certificates of nomination by a convention
or primary meeting shall be in writing and signed by the presiding officer and secretary of such convention or primary meeting. (Election Laws, sec. 26; 1st Sess. Laws, pp. 62, 63.)
There are only two other certificates of nomination provided
for under the election laws: One by the electors, without a
convention or primary meeting. (Election Laws, sec. 28;
1st Sess. Laws, 63.) One by a committee appointed by a convention or primary meeting to fill vacancies. (Election Laws,
sec. 34; 1st Sess. Laws, p. 65.) There were no such certificates filed by the People's party nominating John Scott for
said office. The assemblage known as the Taxpayers' convention, which purported to nominate John Scott for the office of
clerk of the district court, was not a convention or primary

meeting within the meaning of section 25 of the Election Laws.
(1st Sess. Laws, p. 62.)   The provisions of the statute govern-
ing the nominations and filing certificates for an election to a
public office are mandatory and must be strictly followed.
(*Price v. Lush,* 10 Mont. 61, 24 Pac. 749; *Lucas v. Ringsrud,*
3 S. Dak. 355, 53 N. W. 426; *State v. Barber,* 4 Wyo. 56, 32
Pac. 14.)   The language of a statute to be construed must be
consulted and followed.   Statutes that expressly declare any
particular act essential to a valid election are imperative and
considerations of its policy or impolicy must be addressed to
the legislature, and no room is left for construction.   (Mc-
Crary on Election, sec. 190; *Bartlett v. Morris,* 9 Port. (Ala.)
268, 269; Sedgewick on Statutory and Constitutional Law,
325, 326, note 327, 328; *Slaymaker v. Phillips,* 5 Wyo. 453,
40 Pac. 971, 42 Pac. 1049.)   Nearly all the states that have
adopted the Australian method have provided a statute by which
the certificates of nomination are deemed to be valid unless
objections are filed or some action is commenced within a lim-
ited period after filing.   (Kansas: Laws 1893, sec. 10, p. 109;
Colorado: Laws 1894, sec. 13, p. 148; Nebraska: Laws 1891,
sec. 11, p. 243; New York: Laws 1890, sec. 3, p. 485; South
Dakota: Laws 1890, sec. 17, p. 157; Massachusetts: Laws
1890, secs. 5, 9, pp. 477, 478; Pennsylvania: Laws 1891, sec.
6, p. 351.)   Idaho has no such statute.   All, or nearly all, of
the states above mentioned have, in addition to the statute
cited, another statute either identical with or similar to our
section 59, which relates exclusively to the correction of errors
appearing in the printed or published ballot after the candi-
dates have been properly nominated and their nominations
certified.

Eden & Warner and W. C. Love, for Respondent.

On the fifteenth day of September, 1894, the People's party
convention was held.   At the convention, no one was named as
candidate for clerk of the district court.   The convention hav-
ing failed to name candidates for several offices, among them
the office of clerk of the district court, named a committee con-
sisting of Frank Walton, William F. Fisher and F. H. Murphy,

delegating to said committee the power to make the nominations for the offices left vacant by the convention. That the convention had the power to so do, we think, is beyond question. (See *State v. Benton,* 13 Mont. 306, 34 Pac. 301—a case as nearly like the one at bar as does or can ever exist.) And section 34, of First Session Laws of Idaho, page 65, expressly confers this power. Statutes relative to election, should be liberally construed. (*State v. Benton,* 13 Mont. 306, 34 Pac. 301; *People v. Board of Canvassers,* 129 N. Y. 652, 29 N. E. 1032; *Simpson v. Osborn,* 52 Kan. 328, 34 Pac. 749; *Bowers v. Smith,* 111 Mo. 45, 33 Am. St. Rep. 491, 20 S. W. 103; *Allen v. Glynn,* 17 Colo. 338, 31 Am. St. Rep. 304, 29 Pac. 678; *State v. Van Camp,* 36 Neb. 91, 54 N. W. 113; *Stackpole v. Hallahan,* 16 Mont. 40, 40 Pac. 80.) Appellant evidently knew that the auditor of Bannock county had the name of Scott printed on the official ballot under the separate heads, Democratic, People's party and Taxpayers' party, and being an interested party, it was his duty, under section 59, page 77 of First Session Laws of Idaho, to apply to the probate court to have the official ballot corrected, by striking therefrom the name of Scott as the People's party and Taxpayers' candidate if it did not properly belong there, and failing to do this he cannot base a contest on that ground after election. (*Allen v. Glynn,* 17 Colo. 338, 31 Am. St. Rep. 304, 29 Pac. 678; *Bowers v. Smith,* 111 Mo. 45, 33 Am. St. Rep. 491, 20 S. W. 103.)

HUSTON, J.—This is an action brought by the plaintiff against the defendant to try the right to the office of clerk of the district court and *ex-officio* auditor and recorder for the county of Bannock. At the regular biennial election held in this state on November 6, 1894, the plaintiff was the nominee of the Republican party of Bannock county, and his name was placed upon the official ballot as such. The defendant was the nominee of the Democratic party for said office, and was also nominated by the People's party and by the Taxpayers' party for the same office, and his name appeared upon the official ballot of said county as the candidate of each of said parties

for said office. At the said election the plaintiff received, according to the official canvass of the votes cast at said election for said office, five hundred and forty-five votes, and the defendant received eight hundred and eighteen votes. It is claimed by plaintiff that the votes cast for the defendant as the candidate of the People's party, being, as found by the district court, two hundred and seventy-five votes, and those cast for defendant by the Taxpayers' party, being, as found by the district court, forty-six votes, should not have been included or counted in the official canvass, for the reason that said defendant's name as a candidate for said office was placed upon said official ballot as the candidate of said People's party and said Taxpayers' party irregularly, and in contravention of the provisions of the election law of this state. It appears: That on the fifteenth day of September, 1894, the People's party of Bannock county held a convention for the purpose of placing in nomination candidates for the various county offices to be voted for at said election. That said convention left the nomination for clerk of the district court of said county vacant, and that said convention, while in session, duly assembled for the purpose herein mentioned, passed this resolution: "Resolved, that a special committee of three be elected who are authorized to fill all vacancies on the ticket." That said resolution was adopted by said convention, and Frank Walton, Frank H. Murphy and W. F. Fisher were elected as such committee. That said committee organized by the election of W. F. Fisher as chairman and Frank H. Murphy as secretary. Subsequently, and within the time prescribed by the statute, such nomination was duly certified by the chairman and secretary of said committee to the auditor of said county of Bannock, together with the other nominees of said party for county offices of said county. It is contended by the plaintiff that said resolution of the People's party convention gave no power or authority to said committee to certify the name of the defendant to the auditor of said county, or authorizes said auditor to place the name of defendant upon the official ballot of said county as the candidate of the People's party for said office. It is contended by counsel for appellant that under the provisions of section 34 of the elec-

tion law of 1891 such committee has no power to fill any vacancy that is not made or caused by the death or declination of a candidate previously nominated by the convention. Perhaps a strict technical construction of section 34 might support this contention under certain circumstances, but when we consider. this law in the light expressed by an authority cited by appellant, viz.: "The main purpose of the law evidently is to enable voters to express their real wishes by their ballots freed entirely from the influences which might tend to corrupt or intimidate them, and also to provide for printing and distributing at public expense ballots which will afford *all political parties, and considerable groups of electors, a fair opportunity to vote for the candidates of their choice"* (the italics are ours) —we may well doubt whether the construction contended for by appellant's counsel should be entertained. Vacancies may occur in the nominations of political parties from various causes, entirely consistent with honesty of purpose on the part of the convention, and a just and commendable desire on their part to subserve the best interests of the people. Take, for instance, the case cited by counsel for the appellant in their last brief, to wit, that of the Prohibition party's last state convention in this state. Now, we all know what is the primary and underlying principle of that party, and in declining to place upon their ticket any candidates for the offices of judge of the supreme court and attorney general they undoubtedly considered that they were acting for the best interests of their party and of the people, presumably in view of the fact that the candidates for those offices on the Republican ticket were such known and palpable exponents of the fundamental principles of the Prohibition party that any nominations by them would not only be invidious, but an act of supererogation. Counsel for appellant, in their brief, seem to intimate that their contention is supported by the English decisions upon similar statutes. In this counsel are in error, we think, in their application of the rule of the English statute to this case. It is provided by 35 and 36 Victoria (1872), amended in 1875 by 38 and 39 Victoria, page 283, chapter 40, section 1, that the returning officer shall decide on the validity of every objection made to

a nomination paper, and his decision, if disallowing the objection, shall be final, but, if allowing the same, shall be subject to reversal on petition questioning the election or return. It will be seen that in England the erroneous placing of a name upon the ballot, though not corrected before election, is not permitted to work the disfranchisement of the voter.

Much zeal is manifested and much space occupied in the brief of counsel in picturing the fearful results attendant upon any but the strictest construction of the statutes under consideration, and yet we are constrained to think that the agonizing fear of counsel in that behalf is a little overstrained. We have always been under the impression that, however divergent the fact might sometimes be, our government is predicated upon the theory that the American people were capable of self-government, and our election law seems to comprehend intelligence and education in the voter, sufficient to enable him to read the names on the ballot, for he is required to designate the candidate for whom he desires to vote by placing a cross opposite the name of such candidate, and this he must do without assistance extraneous of the ballot itself. Under the old system of voting, the apprehension of counsel was that some voter might be deceived by the placing of the name of a candidate upon more than one place upon the ballot; but it does seem to me that the danger of such deception is reduced to the minimum under a system which requires the voter to read upon the ballot the name of every candidate he would vote for, and distinguish the same by a certain prescribed mark. Of course, there always has been and there always will be, until integrity becomes a more prominent factor in party politics than it ever has been in this country, found means whereby voters may and will be deceived. All legislation upon this subject ought to be directed to the protection of the voter, not only from intimidation and corruption, but from deceit; but such means, when provided, ought not to be so construed as to work the disfranchisement of the honest and innocent voter. Says the supreme court of Missouri in the case of *Bowers v. Smith,* 111 Mo. 45, 33 Am. St. Rep. 491, 20 S. W. 101: "So that the language of section 4772 (Missouri Rev. Stats. 1889) forbidding other bal-

lots than those printed by the respective clerks of the county courts, according to the provisions of this article, to be cast or counted, obviously carries no such meaning as to nullify ballots printed by county clerks as directed by the law, and cast by voters in conformity · thereto, but incorrectly made up before-hand by the Secretary of State or the county clerk by erroneously admitting some candidate's name to a place on the ballot. The suffrage is regarded with jealous solicitude by a free people, and should be so viewed by those intrusted with the mighty power of guarding and vindicating their sovereign rights. Such a construction of a law as would permit the disfranchisement of large bodies of voters because of an error of a single official should never be adopted where the language in question is fairly susceptible of any other." With this view we are in full accord, while it must be conceded that some of the earlier de-cisions, notably in the case of *Price v. Lush,* 10 Mont. 61, 24 Pac. 749, hold to a strict construction of these statutes; but that rule no longer obtains. We have not been cited to, nor have we found, any case since *Price v. Lush* (and that case has since been overruled by the court that rendered the decision). In *Stackpole v. Hallahan,* 16 Mont. 40, 40 Pac. 80, which sup-ports the contention herein, counsel for appellant cite with a degree of confidence the case of *Lucas v. Ringsrud,* 3 S. Dak. 355, 53 N. W. 426. An examination of this case shows that the proceedings therein were prior to the issuing of the official ballot, and, of course, before the election. The decision in that case did not involve the question of the disfranchisement of a large number of electors on account of the failure of some of-ficial to comply with all the duties of the statute in the prep-aration and printing of the official ballot. The action in *Lucas v. Ringsrud* was *mandamus* to require the Secretary of State to prepare the official ballot in compliance with what were claimed to be the provisions of the statute. Section 59 of our law con-cerning elections and electors provides that: "Whenever it shall appear that an error or omission has occurred in the publica-tion of the names or descriptions of the candidates nominated for office, or in printing of the tickets, the probate court of the county may, upon application of any elector, by order require

the county auditor or municipal clerk to correct such error, or show cause why such error should not be corrected." This or a similar provision obtains in all of the statutes predicated upon what is known as the "Australian Ballot Law," and it has, we believe, been uniformly held under such statutes that, where a party neglects to avail himself of this provision, he cannot, after awaiting the result of the election, and finding himself defeated at the polls, seek to defeat the expressed will of the voters upon the technical error of an officer, which he might have had corrected had he invoked the provisions of the statute at the proper time. (*Bowers v. Smith,* 111 Mo. 45, 33 Am. St. Rep. 491, 20 S. W. 101, and cases therein cited.) The equity and righteousness of this rule must, we think, be apparent to any mind not warped by the zeal of partnership. The plaintiff had abundant opportunity, under the law, to have any of the alleged errors in the ballot corrected before the election, and, having neglected to avail himself thereof, he cannot now be heard to urge such objections when their recognition would avail not only to defeat the express will of the voters, but to disfranchise hundreds of legal voters. It may well be doubted whether, had the result of the election been different, we would have heard such a zealous, eloquent and voluminous appeal for a strict construction of the statutes as is presented on behalf of the plaintiff,

The somewhat vindictive attack of counsel upon the assemblage of citizens who met at McCammon, and who are denominated in the brief as the "Taxpayers' Party," while it might pass muster in a political stump speech, can hardly be accepted by any court as argument. It is true, there were not a great many people present, but the statute, although in my opinion it contains much that had better been left out, does not assume to prescribe any number of people requisite to constitute "a convention or primary meeting" under the statute. The language of the statute is as follows: "A convention or primary meeting, within the meaning of this act, is an organized assemblage of electors or delegates representing a political party or principle." (Election Law 1891, sec. 25.) But the learned counsel for the appellant tell us that the convention of the Taxpayers' party

of Bannock county did not represent any political party or principle, and therefore the votes cast for defendant by that party should not be counted. Perhaps the learned counsel, or some one of them, can tell us what political principle except "to get there" is ever involved in a county convention for the nomination of candidates for county offices. The desire for office may have existed in the minds and hearts of the citizens assembled at McCammon, and its intensity or honesty is not to be gauged by the chances of their hopes ending in fruition. Numbers do not control in this matter. "Brute force is many, mind only one." It was a convention or primary meeting under the statute, and the nominees were entitled to a place upon the official ballot.

The question presented by the record is one of much importance to the people of this state, and we have endeavored to give it the consideration due to its importance, and we are constrained, under what we conceive to be a correct interpretation of the law, and a proper recognition of its aim and the purposes and objects sought to be attained by its enactment, to affirm the judgment of the district court, and we are confident that in so doing we are in accord with nearly, if not quite, all the more recent authorities. The judgment of the district court is affirmed, with costs.

SULLIVAN, J.—I concur in the conclusion reached in the opinion of Mr. Justice Huston on the ground that if the nomination of Scott by the committee, and placing his name on the Populist ticket, was contrary to law, the appellant should have made application to have the same corrected before the election.

MORGAN, C. J.—I concur in the affirmance of the judgment of the court below.