## King v. McMahan.

(Decided March 1, 1918.)

Appeal from Trimble Circuit Court.

1. Elections—Contest—Statute.—Under section 1471 of the Kentucky Statutes providing that a voter may vote for a candidate by writing his name under the designation of the office and placing a cross mark to the right of his name, the failure of the voter to place a cross mark to the right of the candidate's name which he had written on the ballot did not satisfy the statute, and the ballot should not be counted for any one.

2. Elections—Primary Elections—Nomination—Certificate of.—That portion of section 1453 of the Kentucky Statutes which authorized a nomination by petition to be printed under the device and title

of the candidate's political party as if nominated by a convention, was repealed by the primary election law (sec. 1550 Ky. Sts.), which provides that all candidates for elective offices shall be nominated; (1) by a primary election held under that act; or, (2) by certificates of nomination by the governing authority of the political parties.

3.   Elections—Name of Candidate on Ballot Without Authority.— Where a political party failed to nominate a candidate for magistrate in a primary election and a candidate for that office procured the county court clerk to print his name upon the official ballot and under the column headed by the device of one of the political parties, the name of the candidate was placed upon the ballot without authority of law, and he was not entitled to have counted for him either the ballots on which the voter had stamped the cross mark under the emblem at the head of the column, or those ballots on which the voter had stamped the cross mark opposite to the printed name of the candidate.

JOHN W. BARNES and MOODY & BARBOUR for appellant.

CHARLES CARROLL for appellee.

Opinion of the Court by Judge Miller—Reversing.

At the general election held on November 6, 1917, the appellant D. H. King, and the appellee C. B. McMahan were candidates for justice of the peace in magisterial district No. 1, in Trimble county. King's name was not printed on the official ballot; the votes for him were cast by voters writing King's name in the blank space left upon the ballot for that purpose.

McMahan was not nominated by any party at the August primary election, or by the governing authority of any party.

But a petition signed by 24 Democratic voters and one Republican voter of the magisterial district was presented by them to the clerk of the Trimble county court with the verbal request that McMahan's name be printed upon the official ballot under the Democratic emblem; and, it was so printed by the clerk. The petition, omitting the signatures, reads as follows:

"We the undersigned residents of and legal voters in the Milton-Trout Magisterial District known as Magisterial District No. 1 in Trimble county, Kentucky, hereby petition O. S. Joyce, clerk of the Trimble county, Kentucky, court to place the name of C. B. McMahan on the regular November, 1917, election ballot as a candidate for the office of justice of the peace for Magisterial Dis-

trict No. 1, embracing Milton, East Million, and Trout voting precincts."

The election officers certified to the county board of election commissioners that King had received thirteen votes and that McMahan had received 115 votes; and the election commissioners having canvassed the returns as made, they gave McMahan a certificate of election, whereupon King filed this contest. There is no dispute about the facts which are shown by a stipulation of the parties.

In addition to the facts above stated it is agreed that the McMahan petition was not filed by McMahan; that the petition was filed and the request for the clerk to put his name on the ballot was not made by McMahan, but by one or more of the petitioners, but with the knowledge, approval and consent of McMahan; that the clerk did not publish or give any public notice of the fact that McMahan's name had been placed on the ballot and under the Democratic emblem, and that said fact was not known generally to the voters of the district; that a number of voters who voted the Democratic ticket did so without knowing that McMahan's name was on the ballot or under the Democratic emblem; that there were about four hundred Democratic voters in the magisterial district and that only 131 votes were polled in the election in question; that 25 of the petitioners lived in Trout precinct, McMahan's home precinct; that McMahan was and has always been a consistent Democrat, advocating the principles of that party and supporting its candidates, and was therefore eligible to be a Democratic candidate and nominee for justice of the peace; that the Democratic judge at Trout precinct notified all the voters, as they voted, that McMahan's name was on the ballot and under the Democratic emblem; and that King also was a candidate and that if the voter desired to vote for King he should write his name upon the ballot.

From an inspection of the ballots it is further agreed that McMahan's name was printed in the column of names under the Democratic emblem; that on fifteen of the ballots so printed the stencil (X) mark was placed in the square to the right of McMahan's name; that on two of the fifteen ballots the stencil (X) mark was placed opposite the name of every candidate in the Democratic column and on one of said fifteen ballots the stencil (X) mark was placed opposite five of the names in the Democratic column, including McMahan's name; and, that on

100 other ballots the stencil (X) mark was placed in the circle and under the emblem immediately over the Democratic column and not opposite the name of any candidate in the column.

It is further agreed that on eight of the ballots the name of "D. H." King was written in the blank space left for the name of the candidates for justice of the peace and that the stencil (X) mark was placed in the square opposite D. H. King's name; that on five other ballots the name of "Dan" King was written in the blank space left for the name of the candidates for justice of the peace and the stencil (X) mark was placed in the square opposite that name; and, that on five other ballots the name of D. H. King was written, but no stencil mark of any kind was placed opposite either of said five names, nor was any other mark so placed.

McMahan contended below, and renews his contention here by a cross-appeal, that the circuit court erred in counting for D. H. King the ballots that were cast for "Dan" King; that the 100 ballots in which the voter placed the stencil (X) mark under the Democratic emblem without doing more, should have been counted for McMahan thus giving him an aggregate of 115 votes, while King insists that none of the 100 straight ballots should be counted for McMahan, and that the five ballots upon which the name of D. H. King were written merely and bore no stencil or other mark opposite the name, should be counted for appellant, thus raising his total vote to eighteen as against McMahan's fifteen.

King also contends that McMahan is not entitled to any of the fifteen votes counted for him, for the reason that his name was illegally printed upon the ballot, and had not been written thereon by the voter as required by the statute.

Speaking in general terms the circuit court restricted the claims of both candidates to those ballots on which the stencil (X) mark had been placed opposite the candidate's name, treating, however, "D. H." King and "Dan" King as the same person or candidate; it rejected King's claim to count those ballots upon which his name was written, but contained no stencil (X) mark opposite thereto; and it rejected McMahan's claim to count the 100 ballots on which the voters had placed the stencil (X) mark under the Democratic emblem at the

head of the column, although McMahan's name was printed in that column.

The circuit court therefore, rejected McMahan's claim to the 100 straight ballots claimed by him, leaving his vote at fifteen; and it also rejected King's claim to the five votes which bore no stencil (X) mark, thus reducing his vote to thirteen, and leaving McMahan with a majority of two votes. King appeals.

It will thus be seen the questions to be determined are, (1) King's right to have counted for him the five ballots upon which his name was written, but which contained no stencil (X) mark opposite his name; (2) McMahan's right to have counted for him the 100 straight ballots in which the only designation by stencil (X) mark was under the Democratic emblem at the head of the column; and (3) McMahan's right to have counted for him the fifteen ballots in which the stencil (X) mark was placed opposite his printed name.

1. Taking up first King's claim to count the five rejected ballots on which the name of D. H. King was written, but without any stencil (X) mark opposite thereto, it will be observed that section 1471 of the Kentucky Statutes specifically provides the manner of voting generally, as well as the manner of voting for a person whose name is not printed on the ballot. The pertinent portion of that statute reads as follows:

"On the receipt of his ballot the elector shall forthwith, and without leaving the room, retire alone to one of the voting booths, as provided, and shall prepare his ballot by marking in the appropriate square a cross-mark (X) immediately following the name of the candidate of his choice for such office to be filled, and in case of a question submitted to the vote of the people, by marking in the appropriate square a cross mark (X) against the answer which he desires to give. Should any elector desire to vote for each and every candidate of one party, he shall make a cross mark (X) in the large square embracing the device and preceding the title under which the candidates of said party are printed, and the vote shall then be counted for all the candidates under that title: *Provided, however,* That if a cross mark (X) be made in the large square including the device of such party, and a cross mark be also marked in the square after the name of one or more candidates of a different party or parties, the vote shall be counted for the candidates so marked, and not for the candidates for the

same office of the party so marked; but the vote shall be counted for the other candidates under such party name or designation. If the elector mark more names than there are persons to be elected to an office, or if, for any reason, it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office. No ballot shall be rejected for any technical error which does not make it impossible to determine the voter's choice. *Nothing in this law contained shall be so construed as to prevent a voter from voting for any qualified person other than those whose names are printed on the ballots for any office to be filled, by writing with black lead pencil, under the designation of the office, the name of such person and placing to the right of such name a (X) mark.* All marking upon the ballots shall be made with black ink stencil. There shall be kept in each booth the necessary stencils and pencils, to be securely fastened by a string or cord of sufficient length to enable voters to use the same.''

The statute thus provides for every possible method of exercising the franchise, that the voter may select; but, it will be observed that in every instance, whether it be by putting the stencil (X) mark under the party emblem, or opposite the candidate's name, or by a combination of the two methods, the stencil (X) mark must be used to indicate the intention of the voter. That duty is imposed upon the voter, and if he fails to indicate his intention by using the stencil (X) mark, he does so at his peril. Usually the dispute over the count of contested ballots arises from the manner in which the voter has used the stencil cross mark, the difficulty being to determine his intention from that act. But it is plain from the several provisions of the statute that unless the voter does use the stencil cross mark he has not expressed his intention of voting for any person.

In Hardin v. Cress, 113 Ky. 734, this court quoted with approval section 724 from McCreary on Elections, as follows:

''The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other of relieving him from the consequence of a failure on the part of the election officers to perform their duties according to the letter of the statute where such failure has not prevented a fair election. The justice of this rule is apparent, and it may be said to be the underlying

principle to be applied in determining this question. The requirements of the law upon the elector are in the interest of pure elections, and should be complied with at least in substance; but to disfranchise the voter because of the mistakes or omissions of election officers would be to put him entirely at the mercy of political manipulators. The performance by the election officers of the duties imposed upon them can be reasonably well secured by providing a penalty for failure to do so.''

Again, in Bates v. Crumbaugh, 114 Ky. 454, this court quoted with approval the following language from Moyer v. Van De Vanter, 12 Wash. 377, 29 L. R. A. 672, 50 A. S. R. 900:

''There is good ground for recognizing a distinction between the obligations placed upon the individual voter and those matters which relate to the duties of election officers. . . . The individual voter may well be called upon to see that the requirements of the law applying to himself are complied with before casting his ballot; and, if he should willfully or carelessly violate the same, there would be no hardship or injustice in depriving him of his vote; but if, on the other hand, he should, in good faith, comply with the law upon his part, it would be a great hardship were he deprived of his ballot through some fault or mistake of an election officer in failing to comply with a provision of the law over which the voter had no control. It is also a question in which the public has a direct and important interest, for the loss of such vote may have a controlling effect upon a public matter.''

This rule is stated in 9 R. C. L. 1129, as follows:

''It is customary in modern statutes to provide in detail not only for the form of the ballot, but also for the manner in which the ballot shall be marked both by the election officers and by the electors. Such laws have generally been upheld by the courts unless their provisions were such as to interfere with the rights of the voters. The rules governing the two propositions are slightly different in their application, it being possible that more liberality is evidenced in cases where the failure to comply with the law is the fault of the election officers, without fault on the part of the elector himself, than is evidenced when the mistake or irregularity is attributable to the elector.''

Again, on page 1131 of the same work it is further said:

"It should be remembered, however, that statutory provisions as to the marking of ballots are in their nature mandatory. And it is within the power of the legislature to prescribe reasonable regulations which the voter must follow in preparing his ballot, and therefore where the statute specifies particularly the manner in which the ballot shall be marked those marked as provided by statute must be counted, and there is no authority for counting any which are not so marked; it being held that whether a ballot should be counted does not depend solely on the power to ascertain and declare the choice of the voter, but also on the expression of that choice in the manner provided by the statute."

The view that the voter must do both acts—write the name of the candidate and stamp the cross-mark opposite his name whenever he desires to vote for a man whose name is not upon the official ballot—was clearly stated in Edwards v. Loy, 113 Ky. 748. In that case Edwards received 42 votes for sheriff. The name of Loy, his opponent, was not printed upon the official ballot; but before handing the ballot to the voters, the clerk of the election wrote Loy's name in ink, in the blank space left on the ballot for the office of sheriff, and several hundred voters received the ballots thus supplemented, and stamped the cross under the emblem at the top of the column containing the names of candidates for county officers in which Loy's name had been written by the clerk.

But no cross mark was made in the square opposite Loy's name thus written by the clerk, and no voter asked the clerk to write Loy's name on the ballot. In determining whether these ballots should be counted for Loy, the court said:

"The ballots which were counted for Loy were not voted for him. The clerk of election was not authorized to write his name upon them. As Loy's name had not been printed on the official ballot as a candidate for sheriff, the voter who desired to vote for him for the office of sheriff was authorized to write his name in the blank space left for that purpose, and stamp a cross in the square opposite his name, and when he had done so, and deposited the ballot in the ballot box, it could then have been counted for him. Section 1471, Kentucky Statutes. The voters neither wrote the name of Loy on the ballot nor stamped in the square opposite the name after one had been written. Such ballots were not voted

for Loy, and should not have been counted for him. It follows from this conclusion that Loy did not receive any votes at that election for the office of sheriff. The election officers in their returns, should not have certified any votes for him. While Edwards received but a few votes, still they were the only ones cast for any one at that election. The 42 votes which he received entitled him to the office, as much as he would have been had he received every vote cast at that election."

From these authorities it abundantly appears that in merely writing King's name upon the ballot and failing to stamp the cross-mark to the right of the name, the voters who cast the five rejected King ballots failed to satisfy the statute, and that the circuit court properly rejected them.

2. Did the circuit court err in refusing to count for McMahan the 100 straight ballots on which the only designation by stencil cross mark was under the Democratic emblem at the head of the column? The propriety of this ruling depends upon whether McMahan's name was legally printed under the Democratic emblem. If it was placed there without authority of law it can hardly be contended that McMahan was entitled to them. By his cross-appeal McMahan insists that these 100 straight Democratic ballots should be counted for him, basing his contention therefor upon the following clause of section 1453 of the Kentucky Statutes:

"*Provided, however,* that if any political party entitled to nominate by convention shall in any case fail to do so, the names of all nominees by petition for any office who shall be designated in their petition as members of, and candidates of, such party, shall be printed under the device and title on the ballots as if nominated by a convention."

This statute above quoted was enacted in 1900, and if it yet remains the law there is no doubt that McMahan might, by a proper petition, have had his name printed under the Democratic emblem. But it is contended by the appellant that the above provision of section 1453 has been repealed by the primary election law of 1912, as amended in 1914, which is now embraced in section 1550 of Carroll's Kentucky Statutes of 1915. Subsection 1 of that statute reads as follows:

"Hereafter all candidates for elective offices to be voted for at any general election shall be nominated; (1) by a primary election held in accordance with the

provisions of this act, or (2) by certificates of nomination signed and filed as herein provided."      .

The second subsection excepts from the operation of the statute candidates for, common school trustee and members of school boards, trustees for towns of certain classes, and candidates for presidential electors; and, subsection 3 further excepts candidates at certain special elections to fill vacancies, providing that nominations in these last named cases may be made in such manner as may be determined by the governing authority of the political party in the territory in which the election is to be held.  . ·

And, subsection 5 of section 1550, after defining a political party, further provides as follows:

"Such political party shall nominate all of its candidates for elective offices to be voted for at the next succeeding general election at the primary election herein provided for, and not otherwise; provided, that when a vacancy occurs after any nomination by death or otherwise, the governing authority of such party may provide for filling such vacancies and make such nominations; and when such nominations have been so made the certificates of nomination shall be signed by the chairman and secretary and the governing authority of the party making same, and shall be filed in the same manner as certificates of nomination at a primary election." Acts 1914, p. 399.

It was clearly the purpose of the primary election law to require all candidates to be nominated either in a primary election or by the governing authority of the political party and "not otherwise," and that it repeals that portion of section 1453 of the statute above quoted, which permitted a candidate to be placed upon his party's ticket in case the party failed to make a nomination. Consequently, as McMahan was neither nominated in the primary nor placed upon the ballot by the governing authority of any party, his name was placed there by the clerk without authority of law.  The clerk's act in this respect was voluntary and wholly ineffectual for any purpose.

Appellee insists, however, that the primary election law did not repeal the provision of section 1453 above quoted, because it applies to a state of case not embraced in the primary election law, to-wit, where there were no candidates before the primary election for nomination and no one was nominated, as we have here; while sub-

section 5 of the primary election law, by its terms, applies to cases where a vacancy occurs "after any nomination."

It is, therefore, argued, that where there has been no nomination, as here, there could not be a vacancy which could be filled by the governing authority of the party, but that it would be a case of a failure to nominate because of lack of candidates, and that the exigency could only be met by applying the old method provided by section 1453 *supra*.

We cannot agree that this is a sound interpretation of the primary election law, since its language is quite broad and expressly provides that the governing authority of the party may supply the candidate whose name is to be placed upon the official ballot whenever a vacancy occurs after any nomination by death or otherwise. This language when taken in connection with subsection 1 of section 1550 providing that all candidates shall be nominated either in a primary election or by certificates of nomination from the governing authority of the party, clearly contemplates that no candidate's name shall go under the party emblem unless the candidate be nominated in one of the two ways indicated. In all other cases the candidate can have his name printed on the official ballot only by petition and under a separate device of his own. Ky. Sts.; sec. 1453.

When the statute expressly provided that nominations could be made in only two ways, and by only two agencies—a primary election or a governing party authority—it necessarily excluded the right of nomination in any other way or by any other agency; and, the fact that no provision is made for permitting a candidate to have his name placed upon his party's official ballot as the nominee of that party when he is not the nominee of a primary or of the governing authority, is no answer to the specific requirements of the statute. In snch a case the candidate has his remedy by going upon the ballot by petition, and under a separate device of his own, as provided by section 1453 of the Kentucky Statutes, applying to general elections.

Whenever, under the present law, a candidate acts independently of party primary elections and party governing authorities, he necessarily becomes an independent candidate, and can have his name printed upon the official ballot, only as an independent candidate. Hager v.

Robinson, 154 Ky. 492; Gardner v. Ray, 154 Ky. 513; Napier v. Roberts, 172 Ky. 227.

The change in the primary election law, above pointed out, necessarily had that effect. Francis v. Sturgill, 163 Ky. 650.

It follows, therefore, that since McMahan's name was printed upon the ballot without authority of law he was not entitled to have counted for him any of the 100 straight Democratic ballots upon which the cross mark was placed only under the Democratic emblem, and that the circuit court properly so held.

3. There remains for decision this question: Did the circuit court err in counting for McMahan the fifteen ballots on which the stencil cross mark was placed to the right of his printed name?

Appellant insists that as McMahan was not the nominee of the Democratic primary or of the Democratic governing authority, and was not on the ballot by petition, the only way in which he legally could have been voted for was by the voter writing McMahan's name under the designation of the office, and "placing to the right of such name a (X) mark," as provided by section 1471 of the Kentucky Statutes, and that, as McMahan's name was printed on the official ballot without authority of law and was not written thereon by the voter, none of these fifteen ballots should have been counted for him, and that he received no votes at all.

This argument assumes that the unauthorized printing of McMahan's name upon the ballot by the clerk did not relieve the voter of the duty of writing McMahan's name upon the ballot in the blank space in case he wanted to vote for him, and that the voter could not take advantage of McMahan's name being printed upon the ballot and vote for him by placing the stencil cross mark in the square to the right of the printed name.

Appellant seeks to strengthen his argument by pointing out the fact that on two of the Democratic ballots containing McMahan's printed name the voter placed the stencil cross mark to the right of the name of every candidate upon the ballot, thereby using that method, it is claimed, to vote the straight Democratic ticket; that they did not intend to vote for McMahan except under the mistaken belief that he was a regular Democratic nominee; and that for that reason these two ballots, and possibly a third ballot on which the voter placed the stencil mark

opposite five names upon the Democratic ticket, including McMahan's, should not be counted for McMahan, thus reducing his total vote to 12 as against King's 13.

When one carefully considers the purpose of the primary election law, and the great care that was taken by the legislature to preserve the integrity of party nominations, and, at the same time, to afford the independent candidate a full opportunity of having his name printed upon the official ballot, he cannot fail to be impressed by the strength of appellant's argument.

The language of this court in Parrish v. Powers, 127 Ky. 169, speaking through Chief Justice O'Rear, is both pertinent and illuminating. In that case Powers caused his name to be placed upon the official ballots, under the Democratic device, by means of "pasters," a method then authorized by section 1464 of the Kentucky Statutes in cases of the death, removal, or resignation of a candidate after the printing of the ballots.

The statute, however, authorized only the election clerk to place the "pasters" on the ballots; and the clerk could do so only at the direction of the chairman of the political organization of which the original candidate was a member. But in Parrish v. Powers, supra, the "pasters" were furnished by Powers, not by the chairman of his political organization, and Powers caused them to be pasted on the official ballots.

In holding that Powers' name had no rightful place on the ballot; that its presence thereon should have been totally disregarded for all purposes, and the ballot treated just as it was before his name was placed on it, and just as it would have been if his name had not so appeared upon it, the court said:

"When names are placed on an official ballot as nominees of a political party, the voters of the party have a right to assume that the candidates are the nominees of the party. If such a practice were tolerated as is shown in this case, party nominations would be of little value, and no confidence could be placed in the official ballots as showing correctly who were the party nominees to be voted for at an election. Each political party is not only entitled to control its own nominations, but it is also entitled to have the ballots so guarded that the voters of the party may have confidence in the ballots as expressing truly who are the party nominees. Were the rule

otherwise, political nominations would be of little value, and the official ballot would be often actually misleading. The provisions of the statute therefore for the protection of the official ballot must be rigidly enforced. The placing of Powers' name on the official ballot was without right, and an election secured by such means cannot be allowed to stand; for Parrish's friends no doubt understood that he had no opposition, and those who voted for Powers simply by stamping under the Democratic device meant, often, only to vote for the Democratic nominees. The placing of Powers' name on the ballot under the circumstances indicated was a fraud, whether so intended or not.''.

It will be readily observed, however, that the facts of the case at bar are different from the facts in Parrish v. Powers, where the voters did not stamp the stencil cross mark to the right of Powers' name, but contented themselves with merely stamping the cross mark under the Democratic emblem, thus treating Powers as the Democratic nominee. But the principle there announced, that where a candidate's name is illegally placed under a party emblem the ballot should be treated as it appeared before the name was placed thereon, and the necessary results of the principle, apply equally to this case.

It having been determined that McMahan's name was illegally printed upon the ballot, the only legal way in which he could be voted for was by the voter writing his name on the ballot under the designation of the office and by placng a cross mark to the right of his name. Ky. Sts. sec. 1471. The voter must do both acts in order to comply with the statute.

In Edwards v. Loy, *supra,* it was held that the clerk could not write the name of the candidate upon the ballot for the voter. If he cannot write the candidate's name upon the ballot, by what authority would he be justified in printing his name thereon? The writing of King's name without stamping the cross mark opposite the name, which we have held invalid, was as efficacious as stamping the cross mark opposite McMahan's name which the voter had not written. But neither satisfied the statute.

That having his name printed under the Democratic emblem gave McMahan an advantage, cannot be doubted. In that way he not only gave notice that he was the Democratic nominee, but invited votes by making it easier for voters to vote for him by merely making the cross mark

to the right of his name, while voters desiring to vote for King had to write his name upon the ballot and make the cross mark opposite his name. The law gave McMahan none of these advantages; and, it is impossible to say what effect they had.

Our conclusion is that the statute must be substantially complied with, that when a candidate's name is not on the official ballot, or not legally there, in order to vote for him the voter must write the candidate's name under the designation of the office and place the cross mark to the right of his name; that placing the cross mark to the right of a candidate's name illegally printed upon the ballot is not a compliance with the statute; and that ballots so marked should be counted for no one.

It therefore follows that King received thirteen votes, and McMahan received no votes. Edwards v. Loy, *supra.*

Judgment reversed with instructions to the circuit court to set aside the former judgment and to enter a judgment declaring King elected. The whole court sitting.