Marshall, C. J.,
dissenting. When this cause was decided, following the first oral argument, it did not seem to be a case of great general interest, but rather one that decided only a controversy purely local in its nature, in which no important principle of state-wide application was involved. The wide discussion provoked by the opinion when first *522 announced has developed the far-reaching and dangerous possibilities which may result. This decision not only takes away the right of independent voting, which was designed to be promoted and safeguarded by the constitution-framers of 1912, but has rendered insecure the tenure of a large number of municipal officers who were elected in 1921.
The disputed ballots in this controversy were seven rejected by the deputy state supervisors on the ground that they had been marked for the same candidate in two different columns, the name having been printed on both the Democratic and Independent tickets. The majority opinion concedes that the ballots should not have been rejected on that ground, and after finding in favor of the legality of the seven ballots then proceeds to declare that the 645 Independent votes cast at that election in ward 23 for the candidate for city council were invalid because the Independent ticket never should have been printed upon the ballot. I heartily agree with the majority opinion in the conclusion that the seven ballots were properly marked and should have been counted, but I emphatically disagree with the majority opinion in the conclusion that the Independent ticket should not have been printed upon the ballot, and I insist, not only that the ballot was a legal ballot, but go one step farther and insist that even though it was improper to print the Independent ticket upon the ballot it was nevertheless an official ballot, and, that, when submitted to all voters, and used by all voters, such ballots as were marked for Independent candidates were entitled to be counted the same as ballots which were marked for candidates in other columns.
*523 I wish to first refer to the right to nominate by petition in cities having a population of more than 2,000. Section 7, Article ’V of the Constitution as amended in 1912, reads in part: “All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law, and provision shall be made by law for a preferential vote for United States senator; but direct primaries shall not be held for the nomination of township officers or for the officers of municipalities of less than two thousand population, unless petitioned for by a majority of the electors of such township or municipality.” It requires no critical analysis of that section to show that it contains no ambiguous language. The majority opinion has reached the conclusion that almost unlimited discretion was reposed in the legislature in the matter of providing for primary elections and nominations by petition. If the constitution-framers had intended that that provision should be given the meaning which has been assigned to it by the majority opinion, it would certainly have been couched in much simpler language. The first portion of the section above quoted contains language which is remotely susceptible to the construction given by the majority, but the contrary construction more nearly accords with the spirit of the entire provisions relating to nominations of officers.
It is the view of the majority that this provision of the constitution is not in any sense mandatory, but merely permissive, and this is shown by the following paragraph which we quote from the majority opinion:
“The constitution-makers delegated to the legislature the authority, therefore, for making nomina *524 tions by petition. If any part of this provision is self-executing it is clear that it is not the part providing for nominations by petition. This authority is clearly consigned to the legislature.”
The constitution makes no difference between the two. The language is “shall be made at direct primary elections or by petition as provided by law.”
If it is discretionary with the legislature as to whether nominations may be made by petition, the same discretion must by the same token rest with the legislature as to whether nomination shall be made by direct primaries.
If the legislature had the right to make a choice of the two methods it might, in amending Section 4996, General Code, have left undisturbed the method by petition and abolished the direct primary. The conjunction “or” clearly creates an alternative, if the majority construction is correct, and neither alternative is superior to the other.
The majority construction has clearly placed it within the power of the legislature to abolish the direct primary by legislation, and the direct prima,ry provisions of the Constitution of 1912 have therefore been by judicial pronouncement placed under legislative control.
The majority opinion is clearly wrong for another reason. Section 7, Article V, creates certain alternative powers by providing that in townships and small municipalities direct primary elections shall be held only if petitioned for. The constitution-framers having invaded the field of alternative methods, it is to be presumed that no further alternatives were intended and that beyond the alterna *525 tives so provided the two methods of making nominations should rest upon a par with each other.
Such construction does violence to the plain mandatory language wherein it is provided “All nominations * * * stoii be made,” etc.
It will be a distinct shock to the people of Ohio to learn- that the direct primary system has been placed at the mercy of legislation, subject to repeal by a bare majority of the two houses, and subject to the further danger of foreclosure of a. referendum on such repeal by the declaration of an emergency..
The purpose of primary elections, which purpose must have been in the minds of the constitution-framers, is to provide for greater freedom of choice, to get a more perfect expression of the popular will, and to eradicate bossism in government. It is difficult to conceive of any plan better designed to encourage bossism and guard against anyone being nominated except those vouched for by the regular political parties, than to require all nominations to be made at primaries. On the other hand, it is difficult to conceive of any plan better designed to encourage the eradication of bossism than independent voting. There can be no such thing as real independent voting if the election laws are designed to prevent independent nominations. The constitution says that nominations “shall be made at direct primary elections or by petition as provided by la,w.” Surely this language is susceptible of the construction that it was intended that the people should have either method available, and that provision should be made by law for regulating either method of nominations. Ample provision had already been made when Section 4996 (E. S. 2966-20; 97 O. L., 226, § 7) *526 was on the statute hooks, and that section was clearly in harmony with the constitution.
The attempted amendment of that section violates the constitutional mandate, and ought therefore be held invalid, and the repealing clause ought also, for the same reason, be held invalid, leaving the original provisions of Section 4996 standing unimpaired. One of the best reasons why the majority opinion is not sound is that there is no possible reason for discrimination against cities of 2,000 inhabitants. It is very seldom that bossism in politics or government is found in small villages, and there was much stronger and better reason for permitting nominations by petition in cities of more than 2,000 inhabitants. This court may take judicial notice of the fact that in more than a score of cities at the last general municipal elections independent candidates were nominated and elected. This clearly demonstrates the spirit and trend of the times. The amendment referred to in the majority opinion was made April 10, 1913, and yet people in municipalities in practically every county in the state have exercised the right of making nominations by petition and hundreds of officials have been elected pursuant to nomination by that method. It is therefore exceedingly unfortunate at this time that the constitutional provisions above quoted should receive the construction given in the majority opinion in this case.
I challenge the power of the legislature to make classification of cities and townships upon the basis of population, with the result that the right to nominate by petition may be permitted in municipalities and townships of small population and denied in those of large population.
*527 If it were a question of classification, and the power of the legislature to classify, so far as providing machinery for elections is concerned, we would have to say that classifications might properly be made, but since the construction involves purely and simply the question whether or not certain cities can be denied altogether the right to make nominations by petition, while granting that right to others, the answer must be in the negative.
There is, however, another and more important question in this record. Whatever opinions we may entertain concerning the regularity of the nominating petition, and the right of the election officers to have the Independent ticket printed upon the ballot, the fact remains that it was approved by the proper election officials, was ordered to be printed upon the ballot, and the deputy state supervisors and inspectors of elections certified the ballot as an “official ballot.” Throughout the statutes pertaining to the preparation, printing, certification and distribution of ballots, repeated reference is found to the expression “official ballot.” Section 5017, General Code, provides what a ballot shall contain. Section 5022, General Code, provides that every ballot to be voted shall be certified on the back as the “official ballot,” over a facsimile of the signatures of the deputy state supervisors and inspectors of elections. Surely the electors have a right to assume that those officers whose duty it is to properly prepare and certify ballots have done their duty in that behalf, and it would be a great travesty upon our election system if the electors themselves should be compelled to assume the risk of irregularities. Election laws are designed to preserve the purity and sanctity of *528 the ballot, and to prevent fraud in the conduct of elections, and it would be difficult to conceive of any fraud greater than that which would be perpetrated upon the electors themselves than to be denied the right to have their ballots counted after having been cast in good faith, where no criticism whatever could attach to them. It was never so designed, nor should the courts permit the laws to be so construed as to limit or restrict the freedom of the ballot where it is sought to be exercised in a manner entirely free from the taint or suspicion of fraud. The official ballot is the vehicle through, which electors operate to convey the expression of their choice of public officials, and the status of this vehicle is similar in all essential respects to that of any official having a public function to perform. Any official who has color of title to his office and who discharges the duties of the office becomes a de facto officer and his acts cannot be collaterally brought in question. The same principle applies to the official ballot employed in conducting public elections. If regular upon its face and certified as official by the proper officials, the electors have a right to assume that it is regular, whether in fact it is in conformity with law or not.
"While this proposition has never before been presented to any court in Ohio, the question has been before the courts of other states where statutory provision is made for an official ballot. The latest authority is In re Johnson, County Auditor, 182 N. W. Rep., 987, 149 Minn., 144. The syllabus in that case states both the facts and the law: “When a candidate or an elector neglects to take steps, under Section 398, Gen. St., 1913, to have the name of a person not entitled to appear on the offidial ballot *529 stricken therefrom, he cannot after the election is held raise a valid objection to counting the votes properly marked for such person; there being no claim that the latter had violated any provision of the election laws.”
Blackmer v. Hildreth, 181 Mass., 29, is to the same effect, and the syllabus states both facts and law: “The requirements of St. 1898, c. 548, §§ 141, 142, 145, as to the time of filing nomination papers and the certificates thereon, although binding on the officers whose duty it is to prepare and pass upon the official ballot, do not invalidate ballots cast for a candidate nominated by papers filed too late and not properly certified.”
In People, ex rel. Hirsh, v. Wood et al., Bd. of Canvassers of Queens Co., 148 N. Y., 142, it was declared: “The votes of innocent electors are not invalidated by irregularities or unauthorized acts on the part of public officers charged with the duty of preparing and printing official ballots, where no irregularity or want of authority appears on the face of the ballots.” This principle was decided notwithstanding the statutes of New York contained a provision that “none but ballots provided in accordance with the provisions of this act shall be counted.”
In Baker v. Scott, 4 Idaho, 596, 43 Pac. Rep,, 76, it was held that where a candidate neglects to have an alleged defect in the official ballot corrected before the election, he cannot raise the objection after the election when he finds himself defeated. In that state provision is made as in Ohio for making objections before the ballots are printed.
In State v. Bernholtz, 106 Ia., 157, it was held that irregularities in making nominations would not in *530 validate the official ballot, but that the votes should be counted notwithstanding the code contained a provision prohibiting the counting of ballots not in accordance with the provisions of that chapter.
The same conclusion was reached, under statutes similar to those found in the Ohio election laws, in the following eases: Peabody v. Burch, 75 Kans., 543; State, ex rel. Brooks, v. Fransham, 19 Mont., 273; Bragdon, Pros. Atty., v. Navarre, 102 Mich., 259; Miller v. Pennoyer, 23 Ore., 364; State, ex rel. Dithmar, v. Bunnell, 131 Wis., 198, and Johnson v. Dosland, 103 Minn., 147.
Only one case has been found in which a contrary doctrine has been declared: King v. McMahan, 179 Ky., 536, 200 S. W. Rep., 956.
Both upon principle and upon authority, therefore, the independent candidate having received a majority of the votes cast, and his supporters having used the official ballot provided by the supervisors of election, and no objection having been made prior to the election within the time limited by the statutes, a gross injustice is done in holding that his vote should not be counted, and in so holding this court stands practically alone.
If this court should be influenced by the claim of irregularity of the ballot by reason of containing the Independent ticket, it would seem that the court should go the whole length and hold that such taint of irregularity pervaded the entire ballot, and further hold that the Republicans and Democrats had no better right to employ the ballot than the Independent voters had. The Independent ticket was printed upon every ballot used in the elections of 3921 throughout the entire city of Cincinnati and the *531 entire election by such ruling might thereby be vitiated.
The defense of irregularity seeks to avoid counting not only the seven ballots, but also the entire 645 ballots cast by the Independent voters in Ward 23. The situation is rendered all the more startling by the fact that this defense is being made by the same officials whose duty it was to see to it that the ballot should be regular and legal. Paragraph 6 of Section 5070, General Code, permits electors to write in the names of candidates, when such electors do not desire to vote for any one of those whose names are printed on the ballot, and if this Independent ticket was not entitled to have a place on the ballot, the Independent voters might have had an opportunity to declare their choice by writing in such names as desired. It is clearly too late to make the objections which have been made in this case, after the ballots have been prepared, printed, distributed and voted. Again, it so happens in this case that Thomas J. Conner had his name printed upon the regular Democratic ticket, and it was therefore no particular advantage to him to have a separate column for an Independent ticket. It has proved to be a detriment to him.
Furthermore the legislature has provided the means of determining whether a ballot is regular, and has provided the machinery for making objections and having them determined before the ballots are printed. Section 5005, General Code, provides: “When so filed, certificates of nomination and nomination papers shall be preserved and be open, under proper regulations, to public inspection. If in apparent conformity with the provisions of this chap *532 ter, they shall he deemed to he valid unless objection thereto is duly made in writing within five days after the filing thereof. ’ ’ It would seem that inasmuch as the board permitted the papers to be filed and proceeded to place the ticket so certified upon the ballot, no further evidence of their being in apparent conformity with the provisions of that chapter should be necessary. It is essential to the perpetuation and the success of any representative government that there shall be a full expression of the will of the electorate, and a deplorable situation would be created if this court should declare and publish that irregularities and errors made in good faith by election officials in the preparation and printing of ballots could be made the grounds of nullifying the choice of the people for the sole reason that the ballots which were employed as the vehicle of expressing their will were merely irregular. Statistics have only recently been published which indicate that in the presidential election of 1920 more than one-half of all persons who were eligible to vote throughout the United States failed to attend the polls or cast any ballot. Every department of our government should unite in giving the fullest assurances to voters that election officials may not fail to count any “official ballot” on the ground of any irregularities in its preparation and printing.